Argued March 12; affirmed April 29, 1941

## BELANGER ET UX. *v.* HOWARD ET AL.

(112 P. (2d) 1022)

Before KELLY, Chief Justice, and RAND, BAILEY, LUSK and ROSSMAN, Associate Justices

*Lawrence B. Osterman* and *Elliott B. Cummins,* both of McMinnville, for appellants.

*Bernard B. Kliks,* of Portland (Dorothy L. Kliks, of Portland, on the brief), for respondent B. F. Baker.

*B. A. Kliks,* of Portland, and *Walter P. Gerber,* of McMinnville, for respondents I. L. and Edith A. Howard.

ROSSMAN, J. This is an appeal by the plaintiffs, husband and wife, from a decree of the circuit court which dismissed their suit instituted for the purpose of securing a rescission of an agreement formed April 3, 1939, by virtue of which they agreed to purchase from the defendants, I. L. and Edith A. Howard, husband and wife, some real and some personal property for a consideration of $5,000. The complaint charged fraud. A third defendant, B. F. Baker, according to the complaint, was the agent of the Howards in effecting the sale. The decree, in compliance with the prayer of the answer of defendants Howard, after dismissing the plaintiffs' suit, ordered strict foreclosure of a contract signed by the plaintiffs upon the day above mentioned wherein they undertook to purchase the aforementioned real property for the sum of $4,000, $1,000 of which was paid concurrently with the execution of the agreement and the balance of which—payable in annual installments—has not been paid. Simultaneously with the execution of the contract, the plaintiffs signed

a promissory note in the amount of $1,000 payable to the Howards in annual sums of not less than $75. The note was the consideration for the personal property. At the same time the plaintiffs signed a chattel mortgage which transferred the aforementioned personal property to the Howards to secure payment of the note. The chattel mortgage stipulated that in the event more than $1,000 was realized out of the personal property, the excess should be applied upon the purchase price of the real property. The decree found: "It is not necessary to foreclose by actual sale said personal property," and states that the contract and chattel mortgage "are in fact one instrument." We shall have no further occasion to refer to the chattel mortgage. As did the circuit court judge who tried this cause, we shall give effect to realities and deem the sale of the real and personal property as one transaction.

The real property above mentioned is 9.11 acres situated in the city of Newberg. It is improved with a seven-room dwelling house, some outbuildings useful for agricultural purposes, an orchard consisting of seven acres, and some pens devoted to the raising of minks. In the orchard there stand 326 bearing filbert trees, 52 small filbert trees, 12 walnut trees, 78 prune trees, and 30 other fruit trees. At the time of the sale the Howards owned 24 minks, 22 of which were in their pens. The minks and some farming implements constituted the personal property transferred by the sale.

To avoid being misunderstood, we state that the purchase price of the real and personal property was $5,000, $1,000 of which was paid to the Howards at the time of the sale. The total annual payment required by the contract was $300.

The complaint alleges that the defendants falsely represented to the plaintiffs that (1) the orchard was

composed exclusively of filbert trees; (2) in 1938 and in the years prior thereto the orchard produced 5,000 to 6,000 pounds of filberts; (3) the Howards were the owners of the minks and could lawfully sell them; and (4) the minks were "healthy fur-bearing mink of good breeding quality."

The complaint avers that the above representations were false in the following particulars: (1) the orchard was not composed entirely of filbert trees, but "contained 75 worthless prune trees"; (2) the orchard did not produce 5,000 pounds of filberts in 1938 or in any other year, but its 1938 production was 2,200 pounds; (3) upon the property there were not 24 minks but only 22 "and said minks were not all healthy, but a large number of said mink were sick, unhealthy, sterile and barren"; and (4) the Howards were not licensed by the state to possess the minks, and, therefore, had no title to them.

The complaint, without mentioning when the plaintiffs discovered that deceit had been practiced upon them, states:

"Upon the discovery by plaintiffs of the falsity of said fraudulent representations, plaintiffs communicated with defendants and offered to rescind the hereinabove-mentioned contract in whole and restore to defendants everything * * * and plaintiffs do hereby offer to rescind said contract and hereby elect to disaffirm the same and tender herewith to the clerk of the above-entitled court a quitclaim deed to said real property * * * and herewith offer and tender to the defendants possession of said real property and personal property."

The prayer, besides asking for a rescission of the transaction of April 3, 1939, asked for judgment against the defendants in the sum of $2,140.67. The basis for

that part of the prayer was the aforementioned payment to the defendants of $1,000 and an averment that the plaintiffs were entitled to $1,140.67 as compensation for their care of the property and for the value of some materials employed in the improvement of the property.

The answer denied all allegations charging fraud and averred that the plaintiffs had breached their contract.

The decree recited:

"* * * plaintiffs have not sustained the burden of proof as to the matters alleged in their complaint, including the matter of alleged fraud; and further that plaintiffs' acts were such as to constitute an affirmance of the contract between the parties. The Court also finds that the mink were not defective in either condition or title; and that the defendant Baker was not the agent of defendants Howard. The Court further finds that the plaintiffs are in arrears and in default in several respects upon the contract entered into between the parties herein, and that the defendants should prevail upon their answer and upon their cross-complaint; and generally the Court finds the allegations of the answer and cross-complaint to be true."

■ The findings which we shall now mention were based upon conflicting evidence. They declare that (1) the charges of fraud were untrue; (2) the minks were not in a defective condition; and (3) Baker was not the agent of the Howards. We have carefully read the transcript of evidence and have examined all of the exhibits. We believe that the trial judge did not err when he concluded that Baker was not the Howards' agent, that the minks were not defective when sold, and that the Howards made no false representations. As we said, the evidence is in a state of conflict upon

the issues covered by those findings. The transcript contains 280 pages. The issues disposed of by the findings involved no difficult principles of law. In subscribing to the trial judge's findings upon those issues, we are prompted in large measure by the fact that he had an advantage which the typewritten transcript of the testimony denies to us—he heard and observed the witnesses. We repeat the statements made in several of our previous decisions, that a party who alleges fraud has the burden of proof and that nothing short of a high degree of cogency will suffice. The plaintiff, Emery Belanger, who conducted the negotiations leading up to this purchase on behalf of his wife and himself, attempted to discharge the burden just mentioned, but, in our opinion, his efforts to do so resulted in his own discredit. We shall now mention an instance or two to illustrate what we have in mind.

Section 39-425, Oregon Code 1935 Supplement, which we shall later consider in detail, required breeders of fur-bearing animals to have a license. The Howards possessed none. Based upon that fact, the plaintiffs attacked their (Howards') title to the minks; then Belanger advanced a step further and swore that the state game commission, through Mr. Frank B. Wire, state game supervisor, refused to issue to him a license. He indicated that Wire's refusal was based upon Howard's neglect to have obtained one. Had that been the fact, Howard's violation of the section of our laws just cited might have possessed some significance. In the testimony which we shall now quote from the record, Belanger positively swore that he had applied for a license and had been refused one, and Wire testified to the contrary.

"Q. Did you ever attempt to get a license for these?
(the minks) A. Yes, sir.

"Q. Did they give it to you? A. No, sir.

"Q. And you asked for it? A. Yes, sir.

"Q. And you mean to say that the state game commission would not give you a license for it? A. Yes, sir.

"Q. Who did you ask? A. Mr. Wire.

     *         *         *         *         *

"Q. And you say positively that you asked Mr.
Wire for a license? A. Yes, sir.

"Q. And when was that you asked him? A. January.

"Q. Of what year? A. 1940."

Mr. Wire, who was wholly disinterested, was asked
and answered concerning this incident as follows:

"Q. Did you ever refuse him a permit or license as
they call it? A. No, sir.

"Q. Did he ever ask for one? A. No, I can not say
that he did, but I talked to Mr. Belanger and his attorney regarding the matter."

Mr. Wire further testified:

"But the law of Oregon plainly states that anyone
in good faith making application for a permit or a license and producing the money shall be issued a permit.
In other words, we have no discretion. If he had said
to me, 'I want a game breeder's permit and I want it
issued' I would have had no discretion as to whether
I would issue it or not; whether I wanted to or not
would be beside the subject, because the laws of the
state of Oregon say it shall be issued."

We believe Wire's testimony.

The incident just reviewed was not the only one
which discredited Belanger. He seemed anxious, as
a witness, to be regarded as a stranger in this state,
wholly unfamiliar with its horticultural conditions. He,

in fact, swore, "I did not know a prune tree from a filbert at the time." When this transaction occurred the plaintiffs were living at Carlton, not many miles from Newberg. Upon cross-examination Belanger was asked, and answered, as follows:

"Q. You looked through the farms during the prior years 1937 and 1938, did you not? A. No, not farms.

"Q. None of them? A. Well, - -

"Q. Is that the first real estate man, you mean to say, that you interviewed was this man Baker? A. For a farm?

"Q. Yes. A. Yes, sir."

Further cross-examination brought forth the fact that before he called upon the defendant Baker he had visited four other real estate agents and had inspected various places with them.

Still another incident which discredits Belanger is the one which we shall now mention. December 17, 1939, eight months after he had purchased this property and some time after he had discovered, so he said, the fraud, he induced the defendant Baker to undertake to find a buyer for the property. He had already advertised the property for sale in The Oregonian, published in Portland, in the issues of December 2, 3 and 4, had received some replies, and had called upon at least two of those who had responded to his advertisements. But a day or two before December 17 he asked Baker to help him sell the property and to write an advertisement. He agreed to pay one-half of the cost of the advertisement's publication. Baker wrote the following and placed it in The Oregonian's edition of December 17:

"FUR AND NUTS

About to Retire? Then See This! 9 a. inside city limits, 7 a. filberts, 2 to 12 yrs., 1½ a. pasture; 7-rm. hse., barn,

garage, fur house for 50 mink. 24 Yukon brood mink. With average luck should produce 72 young mink, 5000 lbs. filberts, 1940. All kinds fruit, fam. use. Lots flowers, shrubs; near bus. sec., yet secluded. Only $1000 cash down, bal. of $5500 E-Z terms, reas. discount for all cash. Or will consider gen. mdse. or grocery stock in exch. B. F. BAKER, 804 1st, Newberg, Or.''

By comparing the statements made in that advertisement with the recital of the alleged misrepresentations contained in the complaint, it is seen that the two are substantially alike. It will be observed that although the plaintiffs agreed to pay the Howards only $5,000 for the place, the advertisement asked $6,500 for the property. As a result of this advertisement several inquiries were received. One came from a Mr. Russell, who lived at Carlton, and to whom Belanger had sold another piece of property. Belanger and Baker called upon Russell and, in accordance with a prearranged plan, Baker told Russell that he (Baker) owned this piece of property. According to Russell, who became a witness for the plaintiffs, the following occurred during the interview: ''Well, he said that it produced 4200 in 1938 and there was a reason it would produce 5000 in 1940. I asked him about 1939 and he said, 'Well, Belanger had the figures on that.' '' ''Q. Was Belanger present? A. Belanger was present, and he said he sold a sack here and there as we all do.'' He added that neither Baker nor Belanger stated the 1939 production in volume of pounds. Belanger gave similar testimony.

Belanger testified that the representations which were made to Russell were false. His words were, ''I knew it wasn't true,'' yet he kept still; he said, ''I didn't say nothing.'' He indicated that Russell would have been defrauded had he purchased the property.

His attitude towards his intended purchaser was thus expressed by him: "That would have been his business." Russell was not the only prospective buyer upon whom the two men called. They were still calling upon persons who responded to the advertisement up to New Years Day.

■ It seems to us that the three incidents which we have just mentioned seriously discredit Belanger as a source of the truth. He came to a court of equity claiming that he had been victimized. Nothing less than frankness should have been manifested by him. In his efforts to prove that he had been defrauded he should not have come forth as a willing perpetrator of fraud upon others. The circuit court judge who heard the testimony found that the plaintiff had not discharged the burden of proof which he assumed when he instituted this suit. We concur in that finding. By his own conduct the plaintiff so discredited himself that we are unwilling to believe his charges of fraud.

Notwithstanding the conclusion expressed in the preceding paragraph, we shall go on and dispose of the plaintiffs' contention that the Howards' title to the minks was defective and the Howards' contention that the plaintiffs' course of conduct after April 3 constituted an affirmance of the contract.

We agree with the trial judge that the Howards' title to the minks was not defective and that the plaintiffs' conduct subsequent to the execution of the contract unmistakably manifested an affirmance of it. We shall now state the reasons which moved us to our conclusion concerning the title to the minks.

We repeat that the bases of this suit are charges of fraud, not averments of mistake, mutual or otherwise. The complaint alleges that the Howards wilfully mis-

represented that they possessed title to the minks when, in fact, "said defendants were unlawfully possessed of said mink and were not duly licensed under the laws of the state of Oregon to possess the same."

The evidence is quite clear that Howard was ignorant of the fact that a breeder of fur-bearing animals was required to have a license. As soon as he heard of the statute he obtained a license. There is no proof that he either wilfully or recklessly misstated the truth. But we shall go on and consider other phases of this issue.

At the time of the transaction of April 3, 1939, the statute, classified as § 39-425, Oregon Code 1935 Suppl., was in effect. That law said:

"Any person  *  *  *  desiring to engage in the business of raising fur-bearing animals, shall make application in writing to the state game commission, for a permit, for which the sum of two dollars ($2.00) shall be charged;  *  *  *  When it shall appear that such application is made in good faith, the state game commission shall issue to such applicant a game breeder's permit,  *  *  *."

Section 39-325, Oregon Code 1935 Suppl., said:

"All fish, game birds, game animals, and furs and/or fur-bearing animals taken by, or in the possession of any person in violation of law, and all guns  *  *  *  shall be seized by any member of the state game commission  *  *  *  and may be forfeited and turned over to the commission by order of the court  *  *  *."

Section 39-201, Oregon Code 1935 Suppl., provided:

"No person shall at any time or in any manner acquire any property in, or subject to his dominion or control, any of the wild game animals, fur-bearing animals, game birds, nongame birds or game fish, or any part thereof, of the state of Oregon."

■ Section 39-325 was amended by 1939 Session Laws, Ch. 205, and § 39-425 was amended by 1939 Session Laws, Ch. 221; but since the 1939 enactments, except those which contained emergency clauses (the two just mentioned did not) did not become effective until June 14, the amendments just cited had no bearing upon the title of the Howards to the minks. Their title was transferred to the plaintiffs April 3.

■ Section 39-201, we are satisfied, has no application to the minks with which we are concerned. That enactment is concerned with fur-bearing animals, etc., which constitute a part of the wild life or common property of the state. It will be observed that the advertisement which Baker wrote at the plaintiff's request described these minks as ''Yukon brood mink.'' There is nothing in the record which indicates that these animals were ever a part of the wild life of this state. So far as we know they had always been in private ownership and were in captivity upon entering the state. Before § 39-201 could have any application to them the proof should show that these animals had constituted a part of the wild life of the state. No such proof was submitted.

■ Before § 39-325 could have any application to these minks the evidence should show that the Howards possessed them in violation of law. The plaintiffs claim that since the Howards had no license of the kind required by § 39-425 this requirement is met. The section just mentioned came into our laws as § 60 of 1921 Session Laws, Ch. 153. Section 77 of the act just mentioned characterizes as a misdemeanor a violation of § 60. But neither § 60 nor its amendment (1931 Session Laws, Ch. 370, § 46) which appears as § 39-425 aforementioned, says that the property of a breeder of fur-

bearing animals shall be forfeited to the state if he possesses no license. In fact, that enactment does not expressly prohibit anyone from engaging in the business of raising fur-bearing animals; it leaves the prohibition to be drawn by inference. Unless we misinterpret this enactment, its purpose is not to limit the raising of fur-bearing animals to those specially qualified, nor to afford the public protection directly against fraud and deception. Since the license fee is only $2.00, the act does not appear to be a revenue-raising measure. The 1939 amendment, which we have already cited, states the object of the act to be: "The provisions of this act are for the purpose of aiding the state game commission in the enforcement of the state game laws and not for the purpose of placing the game raisers under the jurisdiction of said commission." Such being the purpose of the act, it seems that this licensing measure is intended to obtain for the commission information; that is, the information to be set forth in license applications. In this way the commission becomes advised of the identity of breeders of fur-bearing animals and of the locations where they keep their stock. Such information, followed by an occasional inspection of the pens, possibly is helpful in the detection of unlawful inroads into the state's stock of wild life. Again, the information given to the commission through the medium of license applications may have value in the formulation of the state's policy toward breeders of wild animals. But such purposes do not require the forfeiture to the state of the animals of unlicensed breeders. Nor do such purposes demand that an unlicensed breeder's contracts be deemed void. Obviously, the act is not predicated upon a belief that an unlicensed breeder will place upon the market some-

thing injurious to the public welfare, or enter into contracts detrimental to the public interest. Likewise, the purpose of the act is not so overpowering that everything which an unlicensed breeder may do must be struck down in order to deter all breeders from violating this act. Interpreting as we do the purpose of the act as just stated, it does not seem to us that we would be warranted in holding that by necessary implication this act renders void the contracts of unlicensed breeders and deprives them of title to their animals. The objective of the act, that is, to secure for the commission information, apparently can be fully served through the imposition of the penalties authorized by § 77 upon those who fail to obtain licenses. Since the act contains no provision nullifying an unlicensed breeder's title to his animals, and since the purposes of the act do not demand forfeiture of his title, we do not believe that the Howards' neglect to have obtained a license had any effect upon their title to the minks involved in their transactions with the plaintiffs. See *Ford v. Bates*, 150 Or. 672, 47 P. (2d) 951, and the decisions therein reviewed. Therefore, their title was not defective.

The above could well suffice as a disposition of this cause. But, as we have already said, the trial judge, in addition to finding against the plaintiffs upon their charges of fraud, held that after the plaintiffs, through the exercise of their own senses, had come into possession of complete information about the place they elected to affirm the contract of purchase and remain bound by it. Therefore, he decided that the remedy of rescission was not available to them. And, as we have said, we concur in that finding. We shall now review briefly the evidence which shows when the plaintiffs,

through the exercise of their own eyesight, acquired full information upon every subject of the alleged misrepresentation.

Belanger, who at the time of the trial was 50 years of age, said that he was "born on a farm" and that his past experience had been "mostly farming." For four years he had been the assessor of Oconto county, Wisconsin, and at one time was a town supervisor in that state. In 1936 he and his wife moved to Oregon. The plaintiffs visited this place five times before they signed the contract of purchase. They admitted that no one made any effort to conceal anything from their examination, and conceded that they were at liberty to examine the property to any extent they wished. Upon at least one of their visits to the place they were alone. Howard accompanied them to the property only once, if at all. Belanger conceded that Howard told him that he knew nothing about minks and that he added: "You know as much about mink as I do." The Howards had owned these minks for only a short time before this transaction took place.

When the plaintiffs visited the farm the prune trees were in blossom. Upon at least two of their visits Belanger walked to the mink pens and in order to reach them had to pass two of the prune trees. Thus, he must have noticed that there were other than filbert trees upon the place.

The transaction of purchase was consummated April 3. April 8 or 10 the plaintiffs moved upon the place. Belanger testified that on the first day when he fed the minks, "I noticed that there was one mink didn't eat well, and it appeared sickly to me, and I went to Mr. Howard and told him in regard to that mink. He said, 'Yes, there is one there,' he says, 'that don't seem

to feel well * * *.' " Belanger said that mink died in a few days and that he dissected it. He claims that it had "a diseased liver." He testified: "Mr. Baker tried to tell me that it was the food that done it. I thought it was the heat, but I figure it was the liver more than anything." The defendant Baker, who was a real estate man, was familiar with minks. In the early part of April the minks gave birth to their young. Between the 25th and 30th of April four of the young died. Belanger said that they were "chewed up" by their mothers, and added, that by August 5 "I lost ten more." Thus, by August 15 fifteen had died. None were lost after that time. When these deaths occurred the plaintiffs made no effort to rescind the contract and voiced no claim of fraud. It will be recalled that the sale included 24 minks. Two of them were not upon the place at the time of the sale. Howard swore that they were temporarily in charge of a breeder and that this was explained to the plaintiffs at the time of the sale. Belanger swore otherwise. He, however, conceded that on the first day when he fed the animals he discovered that the pens contained only 22. He at once went to Howard and received the explanation which we have just mentioned. November 10 Howard placed two minks in the pens in order to bring the number up to 24. Belanger testified that these two were small and shabby. He at once complained to Howard who told him to go to a Mr. Hochbaum, a breeder, and receive two of a satisfactory kind. Howard's uncontradicted testimony indicates that he offered to pay whatever difference in money Hochbaum would demand. Nothing more was said about the minks.

By October 1, 1939, the plaintiffs had 18 mink pelts from their mink raising. On or about that day Belanger

asked for and received from Howard a written release from the chattel mortgage of these pelts and then delivered them to a dealer for sale purposes. At that time pelts were worth from $8 to $20 apiece. These pelts appear to be beyond the plaintiffs' power to return.

We now revert to the orchard. It will be recalled that the plaintiffs charge that the defendants (1) misrepresented its yield, and (2) told the plaintiffs that it was composed exclusively of filbert trees. The plaintiffs signified no objection to the property because of the presence upon it of the few fig, walnut, apple, peach, pear and cherry trees, but claim that the presence of the 78 prune trees rendered the defendants' representation in regard to the character of the orchard fraudulent. We shall now review the evidence which indicates when the plaintiffs through the use of their own eyesight saw the prune trees and what they then did. It will be recalled that when the plaintiffs first visited the property the prune trees were in blossom and that in order to reach the mink pens it was necessary to pass by two prune trees. A public road constitutes the east boundary of the property and a private driveway its north boundary. Upon all of their visits to the property, except one, the plaintiffs passed along the public road and drove about three-fifths of the length of the north line of the property upon the private road. At that point they entered upon the property. Rows of trees which constituted part of the orchard were adjacent to both thoroughfares, and Belanger concedes that as one took the course just mentioned he obtained "a full sweep" of the orchard.

Belanger plowed the orchard April 10. According to him, "The first time I went through that orchard

thoroughly was between the tenth and first of May when I was pruning, cutting suckers on the bottom of the trees.'' He said that at that time he discovered the prune trees and at once spoke to Howard. ''That must have been before the 15th of May'' he swore. In the course of their conversation, ''I asked him,'' so Belanger said, ''where he sold the prunes and he said they were not worth picking.'' That apparently ended that matter. It may be that upon the occasion just mentioned Belanger did not actually count the prune trees, but, if he did not, it is clear from his testimony that he shortly thereafter counted them. For instance, he swore, ''Later on I went through there and counted them.'' He was asked, ''When?'' and replied, ''About a month or so.'' At that time he counted 78—the entire number that were there. He was then asked, ''Say anything then?'' and replied, ''No.'' Still later he went to the office where Baker and Howard had their desks and engaged in a friendly conversation with them, but said nothing about the prune trees. Shortly he was asked, ''Since May nothing said about the trees?'' His answer was, ''I don't recall of anything said in that period.'' In other words, after he discovered in May the presence of the prune trees in the orchard he mentioned them only casually to the defendants, and upon being told that the prunes were not worth the trouble of picking, dropped the matter.

We shall now mention the testimony which indicates the time when the plaintiffs discovered the facts about the annual yield of the filberts. It will be recalled that the complaint states that the defendants represented that the 1938 crop was 5,000 to 6,000 pounds. Howard swore that his 1938 crop was ''something over 4,200 pounds,'' and that he so represented it. Baker denied

that he represented present production as being over 4,200 pounds. He testified that he told the plaintiffs that after the young trees had developed an annual yield of 5,000 to 6,000 pounds could be expected. The pickers who gathered the 1938 crop became witnesses for the defendants. Their testimony and the defendants' records made at the time of the picking indicates that the 1938 crop was 4,255 pounds. It will also be recalled that when Belanger and Baker called upon Russell they told him that the 1938 yield was 4,200 pounds. Belanger testified that his wife started to pick the 1939 crop in September and that all picking was finished by October 10. The crop was 2,720 pounds green weight which became 2,240 pounds after coming out of the dryer. He testified that he went at once to the defendants "and reported to them that the orchard fell below its production." According to him, "they told me the jayhawks and squirrels had carried them away" and that the figures for previous years were available "at the Oregon Nut Growers." The records of the association just mentioned credited Howard with 1,219 pounds net weight in 1938. Witnesses swore that Howard sold much of his 1938 crop without the aid of the association. Shortly Belanger returned to Howard's office and more was said about the small crop. Finally, Belanger declared: "Gentlemen, get me out of there. I can plainly see that the production is not there and won't be for a number of years to come."

Thus, by the early part of October the plaintiffs had become acquainted, through the use of their own eyes, with the truth about everything which they claim the defendants had misrepresented. About Thanksgiving time Belanger went to an attorney "for advice." Apart from the two words just quoted, his only other

explanation of his purpose in going to the attorney was "to get facts and find out how I stood." What the attorney told him has not been disclosed, but we shall now mention what happened next.

December 2, 3 and 4 Belanger inserted in The Oregonian the advertisement which we have already mentioned and which offered this place for sale. These three advertisements brought some replies and to at least two of those who replied Belanger tried to sell the place. Next, he enlisted the aid of Baker and then there appeared in the December 17th edition of The Oregonian the advertisement quoted in a preceding paragraph. This advertisement also brought inquiries. We have mentioned the one from Russell and the efforts which Baker and Belanger made to sell the farm to him. But Russell was not by any means the only one to whom they tried to sell the place. In fact, between Christmas Day of 1939 and New Years Day of 1940 Belanger, accompanied by Baker, was still visiting prospective buyers endeavoring to sell this property.

During all of the above times the plaintiffs were living in the dwelling house and were still there at the time of the entry of the decree. Belanger swore that the rental value of the house was $15 per month. Howard said that it was worth $20 per month. In the meantime, while the plaintiffs remained in possession they discharged none of the taxes. The amount that should have been paid was $75. According to the uncontradicted testimony the war in Europe materially lessened the demand for mink furs. Reed Farmer, who is engaged in fur farming, and to whom the plaintiffs delivered the aforementioned 18 pelts, said that as a result of the war the market price for mink fur "went haywire." He recited figures indicating that the mar-

ket price of minks and of their fur has become a mere fraction of what it was in April, 1939. The uncontradicted testimony of other witnesses is to like effect.

As we have said, Belanger received from the place 2,200 or 2,400 pounds dry weight of filberts in 1939. He testified that they sold for 11½ cents per pound. He retained the money.

January 18, 1940, Belanger wrote to the defendants I. L. Howard and Baker as follows:

"As you doubtless know, I am extremely dissatisfied with the deal I made last April. I feel that the place has been sorely misrepresented and the income misrepresented on the place. I feel that you gentlemen knew at the time the nuts would not produce the amounts you stated. The acreage was misrepresented. There are about 75 prune trees in the orchard. As for the mink, the title is not there on them. They have been a complete failure. In view of all these things I feel it only fair that you gentlemen pay me back what I have rightfully coming as I feel I have been a victim of fraud. Kindly see me at my residence as soon as convenient."

No tender of a reconveyance or of a willingness to restore anything which he had received accompanied the letter just quoted, nor was a tender made at any other time before this suit was filed. January 25, 1940, the present suit was instituted. We have quoted the part of the complaint which tenders to the defendants a quitclaim deed to the real property. When he was asked why his letter did not offer to return what he had received, Belanger's reply was, "Why didn't they come to see me?" When the question was repeated, he replied, "Just didn't happen to think of it at the time."

In the foregoing review we have omitted details and the narrative of many discussions, but our purpose

has not been to indicate all that was said, but to show when the plaintiffs, through their own activities upon the farm, became fully acquainted with the truth about it.

From the above it will be seen that the plaintiffs had the use of this property from April 8, 1939, to and including the time of the entry of the decree. So far as we know, they are still in possession. They kept the 18 mink pelts and the proceeds of the 1939 filbert crop. Belanger made some changes in the mink pens which Howard swore will necessitate an expenditure of a substantial amount of money to place them in usable condition. In the meantime, payment of taxes has been neglected. And, of course, in the meantime, the plaintiffs speculated with the property—they sought to sell it at a profit to themselves. After their last prospective buyer turned out to be a disappointment, this suit was filed. But it was not filed until three months had passed after the plaintiffs had discovered, with their own eyes, the truth about the place. And, as we have just said, not until they had thoroughly exhausted all of their prospective buyers.

■■ The legal principles applicable to the facts compiled in the preceding paragraphs are not difficult. Mr. Justice ROBERT BEAN, in *Scott v. Walton*, 32 Or. 460, 52 P. 180, set them forth in language which Mr. Justice BURNETT, in *Crouch v. Butler*, 119 Or. 344, 248 P. 849, aptly described as "a classic." They follow:

"A party who has been induced to enter into a contract by fraud, has, upon its discovery, an election of remedies. He may either affirm the contract, and sue for damages, or disaffirm it, and be reinstated in the position in which he was before it was consummated. These remedies, however, are not concurrent, but wholly inconsistent. The adoption of one is the exclu-

sion of the other. If he desires to rescind, he must act promptly, and return or offer to return what he has received under the contract. He cannot retain the fruits of the contract awaiting future development to determine whether it will be more profitable for him to affirm or disaffirm it. Any delay on his part, and especially his remaining in possession of the property received by him under the contract, and dealing with it as his own, will be evidence of his intention to abide by the contract. * * *

"From the time of the conveyance in question the plaintiff had undisputed possession of the Lebanon property, leased and collected the rents thereof, endeavored to sell and dispose of it, and, in short, exercised full and complete ownership over it, without making any offer to rescind, although he admits that he discovered the alleged fraud within a short time after the trade was consummated, and long before this suit was begun."

In *Hornbeck v. Smith*, 87 Or. 78, 168 P. 633, 168 P. 419, it is said:

"* * * he tardily complained of the number of acres which he had ample opportunity to ascertain and which he apparently knew approximately at the time of the deal. He speculated on the cultivation of the farm for two seasons and offers the owner no rent or compensation therefor, but seeks a return of the first payment and of one interest payment made therefor.

"A vendor desiring a rescission of a contract of sale of land must endeavor to restore the status quo and make some recompense for profits derived under the contract * * *. In order to secure a rescission of the contract of sale a vendee must act promptly upon discovery of a discrepancy in the number of acres * * *."

From *Cooper v. Hillsboro Garden Tracts*, 78 Or. 74, 152 P. 488, Ann. Cas. 1917E, 840, we quote:

"It is apparent from his own testimony that the plaintiff became aware of all the facts, except the fer-

tility of the land, as early as May or June in 1912, and he certainly became aware of the quality of the land not later than the fall of that year; and, moreover, the overwhelming weight of the evidence establishes the fact that the soil is of an excellent quality. He admits that he consulted an attorney in January, 1913, with a view of rescinding, and yet in the following April he leased the land in dispute, and subsequently placed permanent improvements on the property. The delay on his part, together with his remaining in possession of the land and treating it as his own, evidence an intention to abide by the contract, and therefore he forfeited any right to rescind  *   *   *.''

The Restatement of the Law is in accord with our decisions from which we have just quoted. See Restitution, §§ 28 and 68—Contracts, §§ 480 and 484.

We are firmly convinced that the plaintiffs' conduct, after they had gained from their experience upon this place adequate knowledge concerning it, constituted an affirmance of the attacked contract and a waiver of their right to rescind, provided any such right ever existed. We believe, however, that no fraud was practiced upon the plaintiffs and that, therefore, they never had a right of rescission.

The decree of the circuit court is affirmed.