Argued October 11; reversed December 13, 1949

# WIDMER ET UX. *v.* LEFFELMAN
212 P. 2d 737

*Francis F. Yunker,* of Portland, argued the cause and filed a brief for appellant.

*John F. Galey* argued the cause for respondents. On the brief were Galey and Galey, of Sweet Home, and Francis E. Harrington, of Portland.

Before LUSK, Chief Justice, and BRAND, ROSSMAN, BAILEY, HAY and PAGE, Justices.

BAILEY, J.

This suit was brought by Wilfred H. Widmer and Joey June Widmer, his wife, against A. J. Leffelman for cancellation of a contract for the sale of a restaurant, known as the KoZee Cafe, based on defendant's alleged fraud, and to recover the money paid thereon by plaintiffs.

The amended complaint alleges that on or about November 15, 1946, defendant agreed to sell and plaintiffs agreed to purchase the KoZee Cafe, owned by

defendant, located at 5311 N. E. Sandy Boulevard in Portland, Oregon, for the sum of $8,000, payable $4,000 in cash at the time of the execution of the agreement and the balance at the rate of $100 per month, with interest at 6% per annum on the deferred payments, and that pursuant to such agreement plaintiffs paid the defendant the stipulated $4,000 and went into possession of the restaurant.

It is then alleged that defendant, for the purpose of inducing them to purchase the cafe, misrepresented to plaintiffs: (1) that defendant had an existing lease on the premises where the cafe was located "with an unexpired term of 9 months and with an option of renewal for one year in addition thereto, all at $75.00 per month"; (2) that such restaurant was qualified for and in a condition to be granted an A rating by the City of Portland; and (3) that there were no bills or claims owed and unpaid by the defendant. Plaintiffs allege that defendant knowingly made such misrepresentations with the intent that plaintiffs should rely thereon in entering into said contract and that plaintiffs did rely on each and every one of such misrepresentations and "have suffered grievous damage therefrom and thereby"; that plaintiffs "have and do elect to rescind said agreement of sale and purchase and have so notified the defendant, and have demanded of the defendant that said agreement be rescinded, and have tendered to the defendant possession of said restaurant and have offered and tendered to the defendant the net reasonable value of the use and operation of said restaurant during the time which they have occupied it, each and all of which has been and is refused by the defendant."

Plaintiffs further allege that they "renew said tender, and have filed with the clerk of the court, for

such disposition as the court may direct, a bill of sale of all of their interest in said restaurant, * * * ; that there is no remaining net reasonable value for the use and occupation of said restaurant after accounting for the sums which have been expended by the plaintiffs in stocking, equipping and operating the same, but nevertheless tender to the defendant such sum, if any, as the court shall determine to be the net reasonable value of such use, occupation and operation''; that because of defendant's refusal to concur in the rescission of the agreement plaintiffs are left in possession of the cafe ''and are compelled to operate the same, by reason whereof additional damages will accrue to the plaintiffs during the pendency of this suit, the exact amount of which cannot be determined until the time of the determination of the rights of the parties at the trial of this case, at which time the plaintiffs will offer proof of said damages and the measure thereof.''

The amended complaint sets forth a further and separate cause of suit, but, inasmuch as plaintiffs have abandoned that cause of suit, we shall ignore it.

Plaintiffs pray for a decree canceling the agreement of sale, and for judgment against defendant in favor of plaintiffs for the sum of $4,000, less ''such sum, if any, as the court shall find to be the reasonable net value of the plaintiffs' use and occupation of said restaurant'', and for other and further relief. The answer denies the allegations relating to the representations claimed to have been made by the defendant.

After a trial on the merits the court found that defendant made the misrepresentations charged against him in the amended complaint, that they were made for the purpose of having the plaintiffs rely thereon, and that plaintiffs did rely thereon ''and have suffered

damage therefrom." The court, in its decree, canceled "the written agreement of conditional sale by defendant to the plaintiffs of the appliances, furniture and fixtures of the KoZee Cafe" effective as of December 7, 1946, and awarded plaintiffs judgment against defendant for $4,000, with interest thereon at 6% per annum from December 7, 1946, until March 23, 1948, amounting to $310, less $1,217.50 for rental for the cafe from November 16, 1946, until March 23, 1948, at the rate of $75 per month, the net amount of such judgment being $3,092.50. From this decree the defendant has appealed.

Defendant, at and prior to the execution of the contract here involved, owned the equipment, appliances, furniture and fixtures of the KoZee Cafe which was operated by his employee, W. J. Myers. The building housing the cafe and the land on which it was located were owned by E. E. Carroll and defendant had a month to month lease thereon. Myers listed this property for sale with Fox Realty Company. This listing stated that there was a lease available, that it expired in one year, and that it could be renewed.

The salesman for the Fox Realty Company, Richard Kimball, knew of this listing agreement, but it is doubtful whether either of the plaintiffs ever saw it. On or about the 15th day of November, 1946, the plaintiffs signed an earnest money receipt wherein they agreed to purchase the restaurant on the terms and conditions stated in the amended complaint, and about the same time defendant signed it, agreeing to sell the property to plaintiffs. This receipt contains the following statements: "Lease expires when? New lease to be written" and "Guarantee of A rating by owner W. J. Myers". At the time this earnest money receipt was prepared

both Kimball and plaintiffs were of the opinion that Myers was the owner of the restaurant. An affidavit signed by defendant on November 16th and given to plaintiffs, referred to by the litigants as a statement of the condition of the business of the restaurant, stated, "New lease to be written". The conditional sales contract for the restaurant was executed on November 16, 1946, and two or three days later plaintiffs took possession of the property.

On or about December 7, 1946, plaintiffs wrote a letter to defendant in which they stated in part as follows:

"Notice is hereby given that we elect to and do rescind the sale by you and purchase by us of the Kozy Cafe at 5311 N. E. Sandy Boulevard, Portland, Multnomah County, Oregon. This rescission is made because of material misrepresentations made to us by you and on your behalf, in reliance upon which we entered into the contract for the purchase of the Kozy Cafe. The most important items which were misrepresented to us were:

"1. We were told that there was an existing lease which had one year and nine months to run and contained a renewal privilege for one more year, all at $75.00 per month. In fact, as you know, the best agreement that could be secured from the owner of the building is for one year.

"2. We were guaranteed an "A" rating as a restaurant. As you know, it will require an expenditure, probably in excess of $100.00, to put the premises in shape to qualify for such a rating."

In this letter plaintiffs tendered to defendant the possession of the restaurant and "the net reasonable value of the use and operation" thereof during the time they had been in possession of it. Defendant refused to acquiesce in plaintiffs' attempted rescission or to

accept the return of the restaurant. Thereafter, and on February 3, 1947, this suit was instituted. Plaintiffs were in possession of the restaurant at the time of the trial. They operated it and paid rental on the premises where it was located from the time they first took possession thereof until January 1, 1948. They have paid nothing on the contract since the initial payment of $4,000.

Defendant's first assignment of error is that the circuit court erred in holding that the defendant had knowingly and fraudulently represented:

"1. That the 'KoZee Cafe' had an existing lease with an unexpired term of nine months with a one year's option in addition thereto;

"2. That it was qualified for and in a condition to be granted an A rating as a restaurant;

"3. That there were no bills or claims owed and unpaid by the defendant."

We shall discuss the foregoing propositions in their inverse order.

The listing of this property for sale stated that the restaurant was to be sold "Free of incumbrances and with all bills paid". At or about the time of the execution of the conditional sales contract, defendant signed and delivered to plaintiffs an affidavit, presumably pursuant to § 70-414, O. C. L. A., of the Bulk Sales Law, in which he stated that "there are no creditors holding claims due, or which shall become due for or on account of goods, wares, or merchandise purchased upon credit, or on account of money borrowed to carry on the business of which said goods are a part". After the restaurant had been transferred to the plaintiffs a few bills against the defendant were left at the restaurant. Among them were the following: Hudson-Duncan,

wholesale grocers, amounting to approximately $83.00; a gas bill which "wasn't very much"; unpaid taxes amounting to fifty some odd dollars; Neon sign, amount not specified; and a telephone bill of approximately $19.50.

Mr. Widmer said that all these bills, with the exception of the telephone bill, were paid by defendant when they were presented to him. Mrs. Widmer stated, in reference to the telephone bill, that Mr. Leffelman "brought the transfer down and that was the reason we assumed his bills for signing the transfer." Mr. Leffelman testified that he had paid the telephone bill to which the plaintiffs referred. Asked why he had not paid the bills to which attention has been directed, he said, "for the simple reason when we closed there he [Myers] gave me a list of bills he owed and I paid them and these have evidently come in since."

■ There is no evidence that defendant fraudulently stated that all the bills against the business had been paid, nor is there any evidence that he did not intend to pay the outstanding bills, if any. The affidavit was primarily for the purpose of protecting the plaintiffs from being charged with claims due or to become due and owing by defendant in connection with his operation of the restaurant. Moreover, plaintiffs have failed to show that they have been damaged by reason of defendant's statement that there were no unpaid bills. *Davis v. Green and Crouch*, 183 Or. 484, 193 P. (2d) 1003.

There was no representation that the restaurant "was qualified for and in a condition to be granted an A rating". The earnest money receipt stated: "Guarantee of A rating by owner W. J. Myers". Plaintiffs and the real estate salesman, at the time of the

preparation of this receipt, thought that Myers was the owner of the property. There is evidence that Myers told the Widmers that it "could be turned into a Grade 'A' restaurant by the use of a very little expenditure". Mr. Gruman, inspector in the Bureau of Health and Sanitary Division of the City of Portland, who inspected the restaurant on December 4, 1946, and reinspected it on January 4, 1947, stated that "just some minor repairs" were required to put the restaurant in condition for grade A rating. Mr. Widmer, in reference to the matter now under discussion, gave the following testimony:

"Q. Why did you not at your expense go ahead and make the restaurant qualify for a Grade 'A' rating? A. For the simple reason I couldn't get a lease. I didn't want to put that much money in to fix it without a lease.

\* \* \*

"Q. Now as a matter of fact, Mr. Widmer, didn't Mr. Leffelman offer you either to bring it up to Grade 'A' rating himself or to let you do it and he would pay the bill? A. Yes, but with my prior dealings with him I thought I better let it ride."

In *Cameron v. Edgemont Investment Co.*, 136 Or. 385, 395, 299 P. 698, this court, in referring to a promise to do something in the future, observed: "It is, of course, elementary that the mere nonperformance of a promise made, or the failure to carry out an intention expressed, in the course of negotiations, is neither fraud nor evidence of fraud: *Dolph v. Lennon's Inc.*, 109 Or. 336 (220 P. 161)." See also Annotation, 91 A. L. R. 1296. An exception to the foregoing rule is that "when a promise is made with no intention of performance, and for the express purpose of perpetrating a fraud, it is a most apt and effectual means to that end, and

the victim has a remedy by action or defense.'' *Elastic Paint & Mfg. Co. v. Johnson,* 127 Or. 647, 271 P. 996, and authorities therein cited. There is no evidence in the record that the defendant made the promise concerning the grade A rating ''with no intention of performance, and for the express purpose of perpetrating a fraud''. In less than three weeks after plaintiffs took possession of the restaurant they notified defendant that they had rescinded the contract.

We shall next discuss the evidence concerning the representations made about the lease on the KoZee Cafe. The complaint, as hereinbefore pointed out, alleges that the defendant, for the purpose of inducing the plaintiffs to purchase the restaurant, knowingly and fraudulently represented that defendant had an existing lease on the property where the restaurant was located with an unexpired term of nine months and with an option for renewal for one year in addition thereto.

Mr. Kimball, salesman for the real estate broker with whom the restaurant was listed for sale, testified that just prior to the execution of the earnest money receipt he and the Widmers had a conversation with Myers, manager of the restaurant, and undoubtedly defendant's agent, which we now quote:

''Q. What was said on that occasion, if anything, concerning a lease? A. According to our listing it was stated that there was approximately a year to run on the lease and we questioned him [Myers] regarding that and he told us there was a year and nine months, he couldn't just recall, but he could produce the lease and look it over to see.
''Q. Did he speak of a written lease or lease papers? A. It would have to be written or you couldn't look it over, yes, sir.
''Q. Was there anything said as to whether he would produce those for examination? A. They

were supposed to have been produced; they were supposed to be transferred to the Widmers.

"Q. Did he give you and the Widmers the name of the landlord at that time? A. Yes; he said that the man that ran the heating or plumbing company next door owned the place.

"Q. Did he give you his name? A. I don't remember.

"Q. What, if anything, was said with Mr. Myers in the presence of the Widmers concerning the necessity or nonnecessity of a lease on the premises? A. Well, the Widmers, they wanted to make a few changes in the kitchen, and after all they were putting quite an investment in the equipment that wouldn't be worth much out on the sidewalk; they would have to have a lease to protect their investment. Mr. Widmer was very much interested in that and he at the time asked Mr. Myers if the lease would be renewable and Mr. Myers said, 'Yes, for at least a year,' which gave Mr. Widmer to understand more or less that there would be a 29-month lease on the place.

"Q. Was that before Mr. Widmer or Mrs. Widmer had paid any earnest money? A. Yes, sir.

\* \* \*

"Q. Now in discussing the lease had anybody raised any question as to whether the lease was transferable? A. Yes, sir.

"Q. Who raised the question? A. Well, I imagine I did; that was my job.

"Q. And with whom did you raise it? A. Before the Widmers to Mr. Myers.

"Q. And did Mr. Myers make any response to that question on your part? A. It seems like he said he didn't see why it couldn't again, or something like that.

"Q. Did he add anything to that? A. Well, he left the impression—I can't remember his exact

words, but he left the impression that the lease had been transferred to him.

"Q. That is, originally it was in the name of somebody else? A. And transferred to him and then he accepted it.

"Q. Did he say whether or not there had been any question about the transfer to him? A. No, he didn't. He just left us with the opinion all you have to do was to go up—keep on paying the rent and when it was renewable go to Mr.—the owner and he would be glad to give him a year's extension."

After stating that he had written the earnest money receipt in which it was stated, "New lease to be written", after the words "Lease expires when?", Kimball said:

"Q. Then why didn't you write in there, 'Lease of one year and nine months to be assigned'? A. Because that wasn't Mr. Myers' testimony; he wanted to re-write the lease.

"Q. He wanted to re-write the lease. Is that what he told you? A. I think they all wanted to re-write the lease. Mr. Widmer wanted a 3-year lease with the privilege of renewal if it is possible.

"Q. So he wanted to write a new lease himself, Widmer did, didn't he? A. It was made mention of the fact that the lease would be transferred for a year and nine months or a new lease could be written. At that time I thought it would be best if we could write a new lease; that is why I put it in there. After all, it was far better to have 3-year protection.

\* \* \*

"Q. \* \* \* Who told the Widmers they could get a 3-year lease? A. Mr. Myers.

"Q. Who told them they could have a 3-year lease? A. Mr. Myers told them they could have a renewal on their lease and probably rewrite the

lease; at the time I asked which would be better and they said re-write the lease, so that is what I put in the earnest money contract.''

Mr. Widmer testified that he told Kimball that

'' * * * I absolutely wouldn't have a place that didn't have a lease; * * *

''Q. Did you tell him how much of a lease you needed? A. Well, it was my understanding at the time it was a year and nine months to go, but I had to have longer than that.

''Q. That is, it was your understanding at the time that what was a year and nine months? A. The lease.

\* \* \*

''Q. You had that understanding from whom? A. Well, according to the listing, it was on there. I told him that would be all right if there was a new lease could be written.

\* \* \*

''Q. In the evening conversation did you say anything to Mr. Myers, or to Mr. Kimball in Mr. Myers' presence, concerning the lease? A. Well, it was all talked over between the three of us.

''Q. And what was said? A. Well, they had a lease.

''Q. What did Mr. Myers say in that connection? A. Well, he said they had the lease and it could be renewed, it was renewable.

''Q. Was there any talk about whether the existing lease would be assigned or a new lease written? A. Well, personally I wanted a new lease written with a longer term and also a clause in there with an option for renewal.''

It was Mr. Widmer's understanding ''that Myers at that time had a year and nine months lease'', that

the duration of the lease was not satisfactory, and that he went through with the deal thinking that Myers would have the lease renewed. Mr. Widmer testified that Mr. Myers promised to introduce him to Mr. Carroll, the owner of the property, so that he could talk to him about a new lease on the property. At the time the contract was signed, Mr. Carroll was out of town and did not return for a week or ten days. Upon his return Mr. Widmer called on Mr. Carroll, introduced himself, and inquired about the lease on the property. Mr. Carroll told him "there was no lease on the place, there was none available, there hadn't been any in the past and he wouldn't give any in the future".

Mrs. Widmer testified that she got the impression from what Myers said that there was a lease on the property which had "a year and nine months to run," and that it was "a very simple thing of getting it renewed". She stated that she would not have bought the restaurant if Myers had not told her that there was a lease on it.

The defendant stated that the restaurant was operated on a month to month tenancy, and that he had had a talk with Carroll, who "gave me to understand that he would give a year to year lease." He testified that the Widmers asked him about a lease, and "I said the landlord had promised a year to year lease."

Mr. Carroll testified that Leffelman had not asked him for a lease prior to the sale to the Widmers. Within a month after the sale Leffelman made a request for a lease which he had refused to give at that time.. Under date of July 17, 1947, which was approximately eight months after plaintiffs took possession of the property, and over seven months after they had rescinded

the contract, Mr. Carroll wrote Mr. Widmer a letter in which he said:

"This letter is written to ease your mind regarding the lease which has been much discussed. At no time have I ever indicated to anyone that I would give a lease on the KoZee Cafe building until the sellers of the cafe equipment to you got themselves into a mess by promising you a lease. I finally consented to give a one-year lease. This letter will assure you that you may have possession of the property for one year from the date you took over the cafe for a rental of $75.00 per month.
\* \* \*

"This letter will also serve as notice to you that I will want possession of the property on July 1, 1948. \* \* \*"

Mr. Carroll testified that he had had a serious operation in June, 1947, which had necessitated the postponement of his plans as to the use of this property.

■ Myers was not called as a witness. In his brief defendant asserts that the statements claimed to have been made by Myers "are not chargeable against him, there being no proof whatsoever of any agency and no evidence of any knowledge by the defendant of these statements." The question of such agency is not further discussed by the defendant. He admits that he authorized Myers to list the restaurant for sale. Myers signed the earnest money receipt as agent for defendant. Defendant has received the benefits of the alleged misrepresentations made by Myers, and has made himself a party to such misrepresentations after obtaining knowledge thereof, by retaining such benefits. He therefore cannot repudiate Myers' acts. *Columbia County v. Consolidated Const. Co.*, 83 Or. 251, 267, 163 P. 438; *Boyer v. Edgemont Inv. Co.*, 135 Or. 161, 165, 295 P. 471; 2 Am. Jur., Agency, § 223, p. 177.

■ After carefully considering all the evidence on the subject we are of the opinion that defendant represented to plaintiffs that there was an existing written lease on the premises with an unexpired term of nine months, with the option of renewal for one year; that this representation was false and was made knowingly for the purpose of inducing plaintiffs to rely thereon; and that plaintiffs did rely thereon and would not have purchased the property unless they had understood that there was an existing lease on the property. It is undoubtedly true that plaintiffs desired a longer lease and were led to believe, by what Myers said, that a new lease could be procured for a term longer than one year and nine months. With a lease on the premises the possibility of getting a new lease would have been greatly enhanced. The fraudulent representations as to an existing lease were of sufficient importance to warrant a cancellation of the contract.

Under his second assignment of error defendant contends that the court erred in canceling the contract "inasmuch as the evidence did not show that the plaintiffs suffered any damages by reason of any alleged false representation."

Generally, a restaurant with a lease of nine months, with an option to extend the same for a further period of one year, is more valuable than a restaurant which has a lease from month to month, and this restaurant is not an exception. The contract price of the restaurant was $8,000, and a witness for plaintiffs testified that the reasonable value of the equipment, appliances, furniture and fixtures, which constituted the restaurant, was from two to three thousand dollars. The difference between the contract price and the value of such equipment, appliances, furniture and fixtures,

was based to a large extent on there being an existing lease, and consequently, in the absence of such lease, plaintiffs were paying for something which did not exist. This assignment is without merit.

The third and fourth assignments will be considered together. They are as follows: The court erred in canceling the contract "when it affirmatively appeared that the plaintiffs continued to operate the restaurant after discovery of the alleged fraud", and "in view of the plaintiffs' failure to restore the benefits received by them."

Plaintiffs, upon the discovery of the fraudulent representations made by defendant, had the right either to affirm the contract and sue for damages or to disaffirm it and be reinstated in the position in which they were before it was consummated. *Belanger v. Howard,* 166 Or. 408, 112 P. (2d) 1022. They have elected to pursue the last mentioned remedy. It was, therefore, incumbent upon them to act promptly, and to return or offer to return, upon discovery of the fraud, what they had received under the contract. *Belanger v. Howard,* supra. This they did. In their letter of December 7, 1946, they offered to return to the defendant "the title of, and all possession to, the Kozy Cafe, including everything which was transferred by you to us", but such offer was refused by defendant.

Plaintiffs' offer of restoration having been refused by the defendant, they were only under a duty of reasonable care with reference to the physical condition of what had been received. So long as they retained possession of the property they were under the duty of exercising the care of gratuitous bailees. Restatement, Restitution, § 67 and Comment on Subsection (1),

p. 272. In 2 Restatement, Contracts, § 482, p. 920, is the following:

> "Where an offer to return performance received by a party injured by fraud or misrepresentation is necessary to avoid a transaction and such an offer is made and rejected, in order for the avoidance to remain effective, he must hold for the other party what he has received and refrain from exercising acts of ownership over it, except that after the lapse of a reasonable time the injured party if entitled to restitution can enforce a lien on what he received by selling it and crediting the proceeds towards the payment of his claim."

The use of personal property by the purchaser, after the seller has rejected the purchaser's offer of restoration, will defeat the attempted rescission if the purchaser uses the property for his personal benefit and not merely in compliance with his duty as bailee of the seller. Annotation, 77 A. L. R. 1178.

*Clark v. Wells,* 127 Minn. 353, 149 N. W. 547, L. R. A. 1916F, 476, is in many respects analogous to the case at bar. In that case, after the defendants had refused the return of the business, plaintiff continued to operate it. The court observed that the plaintiff might, perhaps, have notified the defendants that such business and the property pertaining thereto remained at their risk, and have abandoned it. Plaintiff, however, in the court's opinion, "was not required to abandon it, in order to preserve his rights." The court said:

> " * * * Under such circumstances it was at least proper for him, if not his duty, to take such steps as were reasonably necessary to conserve the value of the business. That the party rescinding is not required to abandon the property where the other party refuses to receive it is especially true where the property is of such character that it may

depreciate materially in value if abandoned. It is for the benefit of the one ultimately determined to be the owner of the property that its value be preserved, and the one who refused to receive it is not in a position to complain of any conduct on the part of the other reasonably tending to avert loss.

"Defendants sold and plaintiff purchased the business of manufacturing and vending the products of the Prussian Remedy Company. Plaintiff took over a going business, and its value consisted largely in the fact that it was a going business. If it ceased to be such, much of its value would be lost."

The court then stated that the business remained under plaintiff's control, not from his own conduct but from that of defendants'. We quote further as follows:

" * * * Defendants contend, however, that, after the rescission, he [plaintiff] still conducted the business as his own, and for his own profit. If this be so, it was a waiver of the rescission, but the record does not bear out defendants' contention. Plaintiff offered to prove that, at all times since the rescission, he had been ready to turn the business over to defendants in substantially the same condition in which he received it, and that he is still ready to do so; also that he has appropriated none of the profits, but has kept them on hand ready to be turned over to the defendants. * * * It is also true that plaintiff has paid himself a salary. He was entitled to a reasonable compensation for his services, but could not arbitrarily fix the amount thereof himself. No claim is made, however, that the amount, as fixed by him, was not fair and reasonable."

The court then points out that in operating the business plaintiff had incurred debts and acquired outstanding accounts, and that plaintiff could not require defendants to assume the debts incurred by him, "but

must return the business as free and unincumbered as it was when he discovered the fraud.'' The opinion then continues as follows:

" * * * If, as he claims, he is still able to turn the business back to defendants in substantially the same condition as when he took it over, and is also ready and able to turn over to them the profits which have accrued since he rescinded the contract, he is entitled to recover the consideration with which he parted. * * * ''

See also in this connection *Bergstrom v. Pickett,* 148 Minn. 224, 181 N. W. 343; *Perkins v. Meyerton,* 190 Minn. 542, 251 N. W. 559; *E. E. Atkinson & Co. v. Neisner Bros.,* 193 Minn. 175, 258 N. W. 151.

Plaintiffs were not required to abandon the restaurant upon the defendant's refusal to accept the return of the property. By continuing to operate it they were not treating the property as their own. When the offer to return the property to defendant was made plaintiffs offered to pay a reasonable rental for the use thereof up to the time of the tender, and in their amended complaint they offered to pay the defendant ''such sum, if any, as the court shall determine to be the net reasonable value of such use, occupation and operation'' of the property during the period which they retained possession thereof. By offering to pay for the use of the property it is apparent that they were not claiming it as their own. Mr. Widmer stated that he closed the restaurant in January, 1948, upon being advised that the case ''would come to trial during February'' of that year.

The court found the reasonable value and use of the ''appliances, furniture and fixtures'' of the restaurant while in plaintiffs' possession was $75.00 per month. This included the period from the date plaintiff took

possession to and including the 23rd day of March, 1948, the date on which the trial began. It is not claimed that $75.00 a month is not a reasonable rental for the time plaintiffs had possession of the property prior to December 7, 1946, the date of their rescission.

In our opinion, after the date of the attempted rescission of the contract by plaintiffs, they operated the restaurant for the benefit of the defendant and they should therefore account to him for all the profits which they made during the time they operated it subsequent to December 7, 1946. In determining the amount of such profits the plaintiffs should be entitled to reasonable compensation for their services, in addition to the necessary expenses incurred in operating the restaurant.

The decree appealed from is reversed and the cause remanded for the purpose of determining the amount of profit realized by the plaintiffs subsequent to December 7, 1946, and for such further proceedings as are not inconsistent with this opinion.

Costs will not be allowed to either party.

PAGE, J., dissents.