Argued March 4, reversed with directions May 13, 1953

# SCHULER ET UX. *v.* HUMPHREY ET UX.

257 P. 2d 865

460

*William D. Green, Jr.,* of Roseburg, argued the cause and filed a brief for appellants.

*Paul E. Geddes,* of Roseburg, argued the cause and filed a brief for respondents.

TOOZE, J.

This is a suit for the rescission of a contract for the sale and purchase of approximately 400 acres of land, with livestock and equipment, located in Douglas county, Oregon, brought by William A. Schuler and Cecelia Schuler, his wife, as plaintiffs, against Carlyle H. Humphrey and Gladys E. Humphrey, his wife, as defendants. The trial court denied plaintiffs' right to rescind and entered a decree in favor of defendants for a strict foreclosure of the contract. Plaintiffs appeal.

On or about March 30, 1947, at Los Angeles, California, the plaintiffs and defendants entered into a written agreement whereby plaintiffs agreed to purchase and defendants agreed to sell 430 acres of land, more or less, situated five miles north and approximately three-fourths mile west of Roseburg, Oregon, on Garden Valley road and known as the C. E. Humphrey ranch. Certain livestock and farm equipment were included in the sale. The purchase price agreed upon was $37,500, to be paid as follows: $10,000 in cash upon execution of the agreement, which sum was paid by plaintiffs; $10,000 to be paid in escrow upon the

opening of the escrow; the balance of $17,500 secured by "a first trust deed" covering the premises, to be paid in five equal annual installments, plus interest at five per cent per annum, the first installment with interest to be due and payable April 1, 1948.

On March 31, 1947, an escrow was opened in California Bank, Van Nuys, California, with the said bank designated as escrow agent. Detailed escrow instructions executed by plaintiffs and defendants were deposited with the bank. Pursuant to the agreement, plaintiffs paid the sum of $10,000 to the bank. According to the escrow instructions, the several instruments required to complete the transaction were to be executed and delivered to the bank by the respective parties, and the several required payments were to be made, on or before 30 days from March 31, 1947.

In their complaint plaintiffs allege that they were induced to and did enter into said contract for the purchase of the real and personal property by reason of certain misrepresentations made to them regarding the same, and upon which they relied, and that upon discovery of the truth, they elected to rescind the contract.

Defendants by their answer denied the making of any false representations respecting the property and denied that plaintiffs, in entering into the contract, relied upon any representations that were made, affirmatively alleging that plaintiffs made a personal inspection of the property before entering into the agreement and relied entirely upon their own investigation and judgment. Defendants also allege that after plaintiffs discovered the alleged fraud, they moved upon and took possession of the premises, and by their conduct waived all claims of fraud and any right to rescind which they might have had. By way of cross-

complaint defendants pleaded a breach of the contract of sale by plaintiff and prayed for strict foreclosure.

Plaintiffs by their reply denied all the affirmative allegations of the answer contradictory to the allegations of their complaint.

For the sake of convenience, we shall hereafter refer to William A. Schuler as plaintiff, and to Carlyle H. Humphrey as defendant.

Plaintiff was born in Los Angeles, California, and at the time of trial was 34 years of age. Aside from a period of five years, his home had been in California at all times prior to the transactions involved in this litigation. When he was 11 years of age, he moved with his father to Shelton, Washington, where his father operated a muskrat farm. He left there and returned to California when he was 16 years of age. He graduated from high school and then spent one and one-half years at Porterville Junior College in California, where he took a one-year course in agriculture, about a third of the course being devoted to general farming, and the remainder to the growing of citrus fruits. He worked in the orange groves in California. For three years he was employed as a car loader for American Fruit Growers. About 1940, he purchased a 20-acre orange grove and operated it until he entered the United States Air Force in the spring of 1941. He remained in active service for four and one-half years. Upon his return to civilian life, he resumed the operation of his orange grove and after one year sold it. Except for passing through the state of Oregon on his way to and return from the state of Washington, and one short vacation trip into this state, plaintiff had never been in Oregon and consequently was wholly unfamiliar with the local farming conditions and livestock raising.

Defendant was born and reared on a farm. When he was 21 years of age, he went to Yakima, Washington, and for eight years was employed in a commissary grocery. During that time he dealt more or less with sheep and cattle. He took supplies to the sheep shearers at shearing times and spent considerable time with the shearers. For a long period of time immediately prior to 1943, and at time of trial, defendant resided in Los Angeles.

In March, 1943, defendant purchased from one Herbert G. Hastings approximately 500 acres of land located in Douglas county. The land involved in this litigation is a part of that 500 acres. Defendant paid as consideration for the entire tract the sum of $16,500. Approximately 57½ acres of the land lies east of the Southern Pacific railroad and west of state Highway 99. This tract is referred to in the record in this case as the hay field. Another part of the land comprising 23½ acres lies between the North Garden Valley road and the Umpqua river. This piece is designated by the witnesses as the alfalfa patch. Both of these tracts of land were excepted from the 430 acres, more or less, sold to plaintiff.

After purchasing the land in 1943, defendant moved upon the premises and for a period of 18 to 20 months resided thereon and farmed the same. The buildings on the property were in a state of disrepair, and new fences were required, as well as repairs to portions of the old.

Defendant made certain improvements on the premises. He cleaned, painted, and plastered the dwelling house, doing most of the work himself. He also repaired the roof and built a porch. He built a new hay and implement shed with a lean-to, and reshingled the barn. He erected approximately 750 rods of new

fence. He also purchased seed for permanent type grasses such as tall fescue, chewing fescue, lotus, subterranean clover, and red clover, and sowed about 200 acres. This seeding was done in 1945 and 1946. To secure an ample water supply for household uses, defendant had a new well drilled, to a depth of 112 to 115 feet, and purchased pumping equipment therefor. He put in a new lawn near the house, using top soil from the river bottom for the purpose, and repaired the fence around the lawn. Some farming equipment was purchased, which included a John Deere tractor, a walking plow, a disc, a clod breaker, a lime spreader, a harrow, a 14-inch John Deere hammermill, a power mower, a hay rake, a Dodge two-ton motor truck, and other miscellaneous tools.

At the time the agreement between plaintiffs and defendants was entered into, defendant owned and had on the ranch 60 to 65 purebred Hampshire ewes, with 45 purebred Hampshire lambs; 60 to 65 grade ewes, with approximately 47 grade lambs; and 13 purebred Hampshire rams. He also owned a team of draft horses, a saddle mare, a registered shire mare, a two-year-old colt, and a number of chickens and geese.

To assist in the operation of the ranch, defendant employed help. In 1944 and during most of 1945, one Walter Krozier farmed the place of defendant. From November 1, 1945, until May 1, 1947, John J. Newnes was in charge of the ranch operations for defendant. During the latter months of his employment, Newnes was paid for his services at the rate of $150 per month.

Defendant sold the 23½ acre alfalfa patch for $16,500 prior to trial. As a witness, he placed a value of $300 per acre upon the 57½ acres withheld from the sale to plaintiffs. This is the part designated as the hay field.

One Paul Herbold is a duly licensed realtor with offices in Encino, California. On January 15, 1947, defendant listed 430 acres of his Douglas county ranch with Herbold for sale at the fixed price of $37,500. Herbold prepared a prospectus describing the land and its attractive features. This prospectus was for general circulation. Herbold also advertised the ranch for sale in certain publications, one of which was the Western Livestock Journal. The information contained in the prospectus was that furnished Herbold by defendant. Defendant testified:

"Q Mr. Humphrey, when did you first observe this prospectus that had been prepared by Mr. Herbold?

"A I presume, roughly guessing, a week after we listed the place with Mr. Herbold.

"Q When did you first list it with Mr. Herbold?

"A For $39,500.

"Q When did you first list it with Mr. Herbold?

"A I have a copy of the listing, which I presume has a date on it.

"MR. GEDDES: Approximately how long before this sale?

"A Probably a week. I have it here; I intended to bring it—Janaury 15, 1947.

"Q Now, Mr. Humphrey, you stated on direct examination that the information contained in that prospectus was information that was given Mr. Herbold by yourself, isn't that correct?

"A That is true.

"Q And at the time this sale was made to Mr. Schuler, you had full knowledge of what was in that prospectus?

"A Yes, sir.

"Q Now, I believe you further testified on direct examination that much of that information was based on your judgment as to what the place would do. Isn't that correct?

"A That is right.

"Q Now, in determining your estimate as to what it would do, over how long a period of time did it take you to come to the conclusion that it would do what you claimed it would do in the prospectus?

"A You mean how many days, weeks or months? That is hard to answer—just what period of time.

"COURT: How long did you own the place?

"A I bought it early, I think in February of 1943, your Honor.

"Q You determined that, didn't you, from your knowledge of the place from the time you bought it until you gave the information to the real estate dealer, didn't you?

"A That is a better answer, sir, than I could give. I will accept that.

"Q That is your answer to the question?

"A Yes, sir.

"Q You contended, did you not, in your amended answer that Mr. Schuler should have been able to determine the truth of all those representations by investigation of two days?

"* * * * * *

"A I presume my answer would be 'yes'."

Plaintiffs first learned about the Humphrey ranch by reading Herbold's advertisement in the Western Livestock Journal. Plaintiff's father, at the request of plaintiff, contacted Herbold respecting it. Herbold gave plaintiff's father a copy of the prospectus, also mailing a copy thereof direct to plaintiff.

The representations made concerning the property, which plaintiffs contend are false, are contained in this prospectus. At the outset, it might be stated that no one contends that Mr. Herbold, the realtor, did not act in the utmost good faith. He had no personal knowledge whatever of this land and was compelled to·

and did rely upon the information given him by defendant. The information about the ranch appearing in the prospectus is on a printed form evidently prepared for Herbold's use in connection with his business. This is indicated by the printed portion thereof at the bottom of the first page, to-wit: "This information is given in confidence and with the distinct understanding that any and all negotiations regarding this property will be handled through this office. The information presented herein has been secured from sources I believe authoritative, but is in no sense guaranteed. The buyer is invited to make his own investigation."

It is obvious that this provision is solely for the protection of the realtor. He is not guaranteeing anything personally. It is apparent that the prospectus was designed for circulation among other realtors. It contains a final clause: "Full courtesy to Brokers."

To all intents and purposes, the statements contained in this prospectus regarding the property are the statements of defendant. Herbold, as his agent, simply acted as his mouthpiece. As will later appear, some of these representations on his part related to material facts and, it is manifest, were representations which he intended should be accepted as true and relied upon by prospective purchasers.

We shall now invite attention to the statements contained in this prospectus which we deem material to the issues of this case.

"ACREAGE: *Four hundred thirty acres* owned; none leased. Two hundred five acres is now seeded to permanent pasture. Because of abundant rainfall irrigation is not required. Remaining 225 acres in natural grazing land, dotted with oak trees and pine trees; no brush.

"* * * * *

"OTHER LAND: The 205 acres now in permanent pasture mixtures is suitable for *irrigated* permanent pasture if desired. *Ample free water from adjoining stream is available.*

"SOIL: Heavy loam, with a very small amount of black adobe. There are no sandy or light soils. *Soils throughout are productive, producing heavy feed yields.*

"TOPOGRAPHY: Of the 430 acres, 305 acres are nearly level (205 acres of which have been farmed and are sufficiently level for irrigation).

"* * * * *

"WATER: Drilled well for domestic purposes near the house. Also an enclosed reservoir fed by very large spring. Ample water in fields for stock from several all-year springs and all-year stream. *This stream rises on the property and at high stages is 15 feet wide, while in the summer it decreases to two feet wide. Ranch has full riparian rights to this stream.* Paralleling the ranch is a nationally famous fishing river which at its driest stages is probably more than 100 feet wide and six to eight feet deep and fast flowing.

"* * * * *

"CAPACITY: *Fifty beef cows plus their calves to weaning time plus some sheep. Ranch will,* if not used for cattle, *carry 400 ewes and their lambs year around.* No supplemental feeding other than of products grown on the ranch will be necessary.

"CROP PRODUCTION: In addition to livestock capacity ranch will produce 50 to 100 tons of hay from permanent pasture mixtures.

"* * * * *

"REMARKS: $37,500 *is not an inflated price. Owner has this amount invested in property.*" (Italics ours.)

■■ Having read and considered the statements contained in the prospectus, and being favorably im-

pressed thereby, plaintiff decided to go to Roseburg and look over the property. On or about March 23, 1947, he, together with his wife and brother-in-law, arrived in Roseburg. The next morning they went to the Humphrey ranch and met Newnes, defendant's employe, who was in charge. Newnes undertook to and did show plaintiff about the place. During this tour of inspection, Newnes made certain representations to plaintiff regarding the ranch, which plaintiffs claim were false. Defendant contends that Newnes had no authority as his agent to make any representations. However, there is an abundance of testimony in the record, including defendant's own admissions, to establish Newnes' agency in the premises. What he said and did at the time unquestionably came within the apparent scope of his authority as defendant's agent, and as to plaintiffs, who are third parties, defendant is bound thereby. In 3 CJS 140, Agency, § 231, the rule is stated:

> "The principal is bound by the act of his agent when he has placed the agent in such position that persons of ordinary prudence, reasonably conversant with business usages and customs, are thereby led to believe and assume that the agent is possessed of certain authority, and to deal with him in reliance on such assumption."

Defendant testified as follows:

"Q Did you instruct him [Newnes] to show any prospects over the place.

"A I asked him to permit people to look at the place, for him to show them—show them the line fences and all.

"Q Did you tell him to inform the people about the place as to what it would do, what had been raised on the premises?

"A I did not tell him what to tell them, no.

"Q  But you told him he could show them.
"A  Yes."

■  From the foregoing, it is obvious that defendant did not place any limitations upon Newnes' actions. He did not tell Newnes what to say to prospects, *nor did he tell him what not to say.* In *Durkee v. Carr,* 38 Or 189, 193, 63 P 117, we said:

"* * * The rule is elementary and universal that every grant of power by a principal to his agent, *where no limitations are apparent,* is to be construed as carrying with it, as an incident thereto, the authority to do all things proper, usual, necessary, and reasonable to carry into effect the objects and purposes sought to be accomplished by the authority conferred: * * *." (Italics ours.)

At the time plaintiff made his inspection, the grass on the place was green and from two to three inches high. He and Newnes walked through a flat piece of land consisting of about 25 acres. A creek ran through the middle of it. The creek was about ten feet wide and one to two feet deep, with an abundant flow of water. Plaintiff advised Newnes of his desire to develop a herd of 12 to 15 milch cows and, in that connection, asked Newnes if he thought the 25 acres could be irrigated from the creek. Newnes replied that he knew of no reason why it could not be so irrigated, and said that the tract would make very good pasture. This creek is the stream described in the prospectus under the heading "WATER", supra. Newnes did not advise plaintiff of the true conditions respecting this stream of water during the summer months when irrigation is needed. As shall later appear, Newnes' failure to so advise plaintiff, coupled with what he did say, constituted a fraudulent concealment of a material fact.

■ When looking at the 225 acres contained in the hill tract, plaintiff asked Newnes what he thought its carrying capacity would be. Newnes advised him that the land had been carrying 65 head of ewes, but that was not near what it would carry, and stated that he thought it would carry 250 ewes with their lambs the year around, with some supplemental feeding. This statement by Newnes constituted more than a mere expression of opinion. It followed his positive statement that "65 head of ewes wasn't near what it would carry". Plaintiff was wholly inexperienced with livestock raising and was seeking information upon which he might base his judgment whether or not to purchase. He was entitled to full and correct information. Newnes had been operating the ranch, and plaintiff had a right to rely upon what Newnes told him.

■ In *Olston v. Oregon W. P. & Ry. Co.,* 52 Or 343, 355, 96 P 1095, 97 P 538, we said:

"Although the matter alleged and offered in proof as constituting the fraud is largely a matter of opinion, yet sometimes a statement of an opinion is necessarily based upon a fact or carries with it such an inference of fact that it can be interpreted as a statement of fact, and where it is known to be false and made with intent to deceive, it may be actionable."

Also see *Ward v. Jenson,* 87 Or 314, 319, 170 P 538; 23 Am Jur 787, Fraud and Deceit, § 29.

The livestock carrying capacity of the land was a material consideration. It was represented in the prospectus.

One of the principal purposes, if not the sole purpose, of plaintiff's personal inspection of the premises was to check on the truth of the statements

contained in the prospectus. Newnes' statement to him tended to confirm the truth of what was said in the prospectus. We shall later discuss the testimony which discloses beyond all peradventure of doubt that the entire ranch did not have the carrying capacity represented in the prospectus, nor as stated by Newnes.

■ One further episode that is worthy of attention occurred upon this inspection trip. There were about five tons of baled hay in the new shed on the premises. Plaintiff inquired of Newnes where it had been cut and was informed that it had been cut in the flat. At the time plaintiff did not know that any part of the original ranch was being withheld from the proposed sale. The truth of the matter respecting the hay is that it was cut from the 57½ acres, the part being excepted from the land which later the plaintiffs contracted to purchase. Good faith and fair dealing required that Newnes advise plaintiff of the truth of the matter. In *Palmiter v. Hackett,* 95 Or 12, 17, 185 P 1105, 186 P 581, this court said:

"* * * when a defendant opens his mouth to make declarations respecting the property involved, he must speak the whole truth, and that a suppression of part of the fact is fraud when made to induce a purchase. This does not infringe upon the rule that individuals dealing at arm's-length must look out for themselves and that mere silence is not fraud where no duty is imposed upon one to speak. A half truth, however, spoken with a design of influencing the opposite party where he has not equal means of knowledge, is in itself fraudulent."

Also see *Dahl et al. v. Crain et ux.,* 193 Or 207, 222, 237 P2d 939.

Insofar as the record discloses, no substantial crops of hay were ever raised on any part of the land except

the 57½-acre tract, though at times grass had been cut for hay on some other parts of the ranch.

■ As a witness, Newnes denied making any representations at all to plaintiff, but we are of the opinion that the evidence strongly preponderates in favor of plaintiffs' contentions.

Plaintiff spent a few hours on each of three days in making his inspection. He dug into the soil on some parts of the land. The soil was damp and dark. To him it appeared to be the same as the black adobe land of Southern California, with which he was familiar. No soil analysis was made.

Plaintiff made no inquiries among the neighbors. He testified and we believe truthfully, that Newnes discouraged such an investigation, giving, according to plaintiff, sound reasons therefor. It is unnecessary for us to discuss the testimony regarding that matter.

From what he was able to observe on his inspection and from the statements in the prospectus, as well as from what Newnes had led him to believe, plaintiff was satisfied with the place and decided to purchase it. Before leaving Roseburg, plaintiff telephoned Herbold as to his desire and was instructed by Herbold to make a down-payment of $500, which he did, delivering a check therefor to Newnes. Upon his return to California, the contract was entered into as above mentioned.

Plaintiffs returned to Roseburg on approximately April 18. The next morning plaintiff went upon the premises and, with Newnes, walked over a portion of the ranch. He found the flat covered with some type of yellow flower that stood above the grass, and the grass appeared as though it had grown only an inch or so since his prior inspection. Newnes explained

the slow growth of the grass by saying there had been no rain since plaintiff's prior visit. Plaintiff then discovered cracks about a half-inch wide all through the ground on the flat. Later, in discussing the matter with people in Roseburg, he learned that irrigation was not practicable, because the creeks dried up in the summertime. He inquired of a man in a furniture store about the country. He was informed: "You want to be careful; don't get any place away from the river;" "he said there was black ground and 'this black mud is just dynamite and the hillside ranches are squirrel ranches, we call them.'"

From what he observed himself, fortified by his investigation among businessmen in Roseburg, plaintiff discovered that the premises had been misrepresented to him. He immediately interviewed Mr. William D. Green, Jr., an attorney in Roseburg.

Inasmuch as plaintiffs had planned on spending a few days in Seattle before going on the premises, and as Newnes was not to leave until May 1, plaintiff and his attorney decided not to take any action until plaintiffs' return from Seattle. At the time of plaintiffs' return on May 1, it would be definitely known whether defendant had complied with the terms of the escrow agreement that called for closing within 30 days. The necessary documents had been mailed by the California Bank to plaintiffs on or about April 19, addressed to the ranch near Roseburg, but plaintiffs had not received them and assumed the escrow agreement had not been complied with. On May 1, a telegram was sent by plaintiff to the bank, asking a return of the $10,000 in escrow. At the same time a letter confirming the wire was sent from Roseburg to the bank. In this letter it is stated: "and the reason for this action is that the terms of the escrow agree-

ment have not been complied with within the time period set forth in such agreement.''

On May 2 or May 3, Newnes was in Green's office, along with plaintiff. At that time Newnes called defendant by long distance telephone. Defendant refused to talk with plaintiff, but he did talk with Green. Green informed him that plaintiffs were rescinding the contract on the ground of misrepresentations. Defendant referred Green to his attorney, one Rufus Bailey, of Los Angeles, at the same time positively refusing to recognize a right in plaintiffs to rescind. Defendant maintained this attitude at all times subsequent, particularly during the extensive negotiations between the attorneys to adjust the matter.

Newnes abandoned the premises on or about May 3, without leaving anyone in charge. At the time there were certain cows on the place to be fed and milked, and also some poultry to be fed. Defendant continued to insist that plaintiffs complete their contract, failing and refusing to place a caretaker in charge of the ranch. For several days plaintiff drove to and from the farm twice each day to care for the cows and poultry. Later, in the light of defendant's attitude respecting the rescission and to protect their own interests as well as defendant's, plaintiffs moved upon the premises and operated them until August, 1948, when defendant resumed possession.

A series of negotiations was carried on by the parties. In June, 1947, attorney Green made a trip to Los Angeles to confer with defendant and his attorney Bailey, for the purpose of working out some adjustment. During the summer of 1947, Bailey made two trips to Roseburg for the same purpose. On October 20, 1947, plaintiffs commenced the instant suit.

478

Plaintiff testified that early in May, 1947, after he had notified defendants of the rescission of the contract, Herbold, defendants' agent, wrote him saying that he had a prospect who was interested in the place at the price of $39,000, and asked if plaintiffs would authorize him to list it. Plaintiffs took the copy of the prospectus sent to them at that time by Herbold and altered it so as to show what plaintiffs thought the place was capable of producing, and returned it to Herbold, accompanied by a letter dated May 13, 1947, in which plaintiff stated:

"This letter will authorize you to list the property known as the Humphrey Ranch for sale, for the total price of $39,000 with 10 per cent commission to be paid to you as broker.

"* * * * *

"I am enclosing herewith your sales letter which we have revised and we authorize you to advertise the property based on the information contained therein."

In Herbold's deposition we find no denial of the fact that he first wrote plaintiffs as plaintiff testified. Neither is anything said about the altered prospectus returned to him with the letter quoted above. The witness was careful to attach to his deposition the letter of plaintiff, but he entirely omitted to attach a copy of, or even mention, his own letter to plaintiffs or the prospectus as changed by plaintiffs. This oversight, if oversight it was, is quite significant. The complete correspondence should have been before the court, not just the part thereof that seemed favorable to defendants' contentions.

Defendants contend that in giving Herbold the authority to sell, plaintiffs exercised a control and dominion over the property inconsistent with a rescis-

sion, and that they thereby waived any rights they may have had to rescind and, in effect, affirmed the contract.

It will be observed that defendants' own agent, Herbold, instigated this attempt toward a sale, but the whole thing proved abortive because Herbold refused to list the property. In his deposition, Herbold testified:

"I made no attempts to resell the Humphrey property because I assumed that the Schuler deal was a completed sale; after receiving a letter from William A. Schuler, dated May 13, 1947, the original of which I am attaching to this deposition, I did contact several prospects who had communicated with me prior to the consummation of the Schuler deal, but took no other definite action or steps to resell the property because I did not consider the listing from Mr. Schuler, as contained in his letter of May 13, 1947, to be valid until the Humphrey-Schuler escrow had been closed and Mr. Schuler and Mrs. Schuler were the legal owners of record of the property."

Insofar as the record discloses, this is the only affirmative action plaintiffs ever took in connection with an attempted resale of the property. It occurred within a few days after rescission and while plaintiff was traveling to and from the ranch in his forced care of the livestock.

As authority for their contention that plaintiffs waived their right to rescind and, in effect, affirmed the contract, plaintiffs cite and quote from the case of *Belanger v. Howard,* 166 Or 408 112 P2d 1022. The facts in the Belanger case are entirely different from those in the case at bar. There the plaintiff Belanger had made several independent attempts to sell the

property; he had visited four different real estate agents, and long after he had discovered the alleged fraud, and at least eight months after he had purchased the property, personally advertised it for sale in The Oregonian. Moreover, Belanger had himself misrepresented the property in his endeavors to resell it, which led this court to say (at page 418 of 166 Or):

> "It seems to us that the three incidents which we have just mentioned seriously discredit Belanger as a source of the truth. He came to a court of equity claiming that he had been victimized. Nothing less than frankness should have been manifested by him. In his efforts to prove that he had been defrauded he should not have come forth as a willing perpetrator of fraud upon others. * * * By his own conduct the plaintiff so discredited himself that we are unwilling to believe his charges of fraud."

It is true that the actions of a defrauded purchaser of real property, in attempting to resell it after discovery of the fraud, is some evidence of a waiver of the right to rescind and of his intention to abide by the contract, but it is not conclusive. It is axiomatic that if a defrauded purchaser desires to rescind, he must act promptly, and he cannot retain the fruits of the contract awaiting future developments to determine whether it will be more· profitable for him to affirm or disaffirm it. Any delay on his part, especially his remaining in possession of the property received under the contract, and dealing with it as his own will be evidence of his intention to affirm the contract. It is largely a matter of intention, and this intention may be established by the actions of a party. Each case must be determined upon its own peculiar facts and circumstances. In this case the plaintiffs had not taken possession of any of the property at the time

they rescinded the contract; they had received nothing under the contract, although they had paid out $20,000. They reluctantly went upon the property after they had rescinded, because defendants refused to place anyone in charge thereof as caretaker. It is obvious that plaintiffs intended only to protect and preserve the property, particularly the livestock, for the benefit of defendants and for their own protection.

Moreover, plaintiffs did not discover the actual falsity of some of the representations made by defendant until they had spent some time upon the premises during the summer of 1947. For example, it was not until then that they were able to and did ascertain for themselves the truth about the water conditions for irrigation purposes. It also took their actual experience upon the ranch to learn the truth about its livestock capacity and the facts as to hay and other crop conditions. They never learned the truth as to the amount defendant had invested in the property until the trial of this case. It is an elementary proposition of law, needing no citation of authority, that even though a purchaser, with knowledge of the fact that some misrepresentations had been made by the vendor, takes possession of the property and exercises control and dominion over it as an owner, it does not bar his right to repudiate and rescind the contract upon the discovery of the falsity of other material representations upon which he relied in making the purchase. Taking the evidence by its four corners, it is clear that plaintiffs, after discovering defendant's fraud, never intended to affirm the contract or abide by its terms. Aside from the more or less isolated instance of attempting to list the property for sale under the circumstances as noted, all of plaintiffs' actions and words after May 4, 1947, were consistent

with a rescission. It would indeed be a travesty of justice to permit defendants to escape the consequences of their fraudulent conduct because plaintiffs, to a degree, consented to a proposition advanced by defendants' own agent.

█ In the light of all the evidence in this case, we are of the opinion that plaintiff's letter of May 13, 1947, addressed to Herbold, did not constitute a waiver of plaintiff's right to rescind, nor did it amount to an affirmance of the contract.

As a part of the negotiations carried on between the attorneys for the respective parties looking to a compromise settlement and adjustment of the whole matter, there was some discussion about a resale of the property. Under date of October 24, 1947, Rufus Bailey, attorney for defendants, wrote William D. Green, Jr., plaintiffs' attorney, in part, as follows:

> "During our last telephone conversation you and I discussed the possibility of having Mr. Humphrey forego filing any legal proceeding for a period of approximately sixty days during which time Mr. Schuler would attempt to sell the property.
>
> "I have discussed this matter with Mr. Humphrey and he is willing to forego the filing of an action until December 1, 1947, provided Mr. Schuler will agree to complete the escrow and the deal with Mr. Humphrey in the event he is not able to sell the property to some third person within that time. We have discussed the matter with Mr. Herbold and he is willing to undertake selling the property provided the proper arrangements are made with him by the parties. As I have stated to you, we are willing to agree with Mr. Schuler that his listing of the property with Mr. Herbold would not prejudice his rights in any litigation which might be filed in the future between Mr. Humphrey and himself."

The record shows that the complaint had been filed in this case four days prior to the date of the foregoing letter. It does not show that plaintiffs ever acted pursuant to the suggestions of Mr. Bailey.

We will now consider the problem of whether specific false representations were made in the prospectus and, if so, whether plaintiffs had the right to rescind the contract on account thereof.

## ACREAGE.

In the first place, the actual land described in the contract between the parties contained only 407 acres, instead of 430 acres, as represented. Ordinarily a variance of 23 acres in the amount of land described as "430 acres, more or less", would not be deemed such a material variance as to warrant rescission. However, as to the particular land involved in this transaction, 23 acres might make a substantial difference in value. If the 23 acres of river-bottom land contained in the alfalfa patch had been included in the proposed conveyance to plaintiffs, a very substantial increase in the value of the whole would have occurred. The same is true had the 23 acres been taken out of the 57½-acre hay field. Defendant owned the adjacent land in sufficient acreage to make good his representation as to 430 acres. Under the peculiar facts and circumstances of this case, we are of the opinion that the variance was material and that the representation as to acreage constituted a misrepresentation of a material fact.

## OTHER LAND.

The evidence is almost conclusive that the 205 acres represented to be in permanent pasture mixtures is not suitable for "irrigated permanent pasture, if de-

sired'', because there is no practical way of irrigating it. Neither is there available ''ample free water from adjoining stream''. From an examination of the entire record, we conclude that it was intended that this representation as to free water referred to the creek on the premises, to which we have heretofore directed attention.

## WATER.

The evidence shows that there is a stream that rises on the property, and that the ranch has full riparian rights thereto. It is true that the stream at high stages of water (during the winter months) may be 15 feet wide, but the evidence also shows that in the summer months, it ordinarily ceases to be a running stream of any width and cannot be used for irrigation purposes.

J. R. Parker who for 16 years had been county agricultural agent for Douglas county, testified as follows respecting this creek:

''Q  Do you have any knowledge of that creek during the summer months?

''A  The upper portion may have a water hole but it is a dry creek—what we consider a dry creek.

''Q  Is there sufficient water there to irrigate in the summertime?

''A  No.''

John Rohr, who had been a resident of Douglas county for about 50 years, and who at one time had used the ranch for sheep, testified:

''Q  Are you familiar with the water situation?

''A  Some, yes.

''Q  Was there water there in the summertime for the sheep?

''A  Well, there was—the creek that run down by there, there would be a little water until about

the first of July, as I remember it there. The stream didn't run all summer.

". "Q Was there any water there for irrigation?

"A Well, I wouldn't think so. No, not enough for irrigation, not for any practical purpose."

Vilas Phillipi, a partner of Rohr when they temporarily kept sheep on the place, testified substantially the same as Rohr with respect to the creek.

Walter Krozier, who farmed the ranch for defendant from the latter part of 1945 to September, 1946, testified:

"Q Are you familiar with the water situation on the ranch?

"A Yes.

"Q What about this stream that runs down through behind the barn?

"A There is a stream there in the wintertime.

. "Q Is there a stream in the summertime?

"A Well, there is a little bit of stream but it isn't what I call a stream.

"Q Is there enough water to irrigate 25 acres?

"A Absolutely not."

Other witnesses testified to the same effect. The representations concerning this creek, particularly its availability for irrigation purposes, were untrue.

## CAPACITY.

The representations that the ranch had the capacity for 50 beef cows plus their calves to weaning time, plus some sheep, are untrue. Also, the statement that if not used for cattle, the place will carry 400 ewes and their lambs the year around, is a gross misrepresentation of the facts. The evidence discloses that the place will not carry more than 165 head of ewes with their lambs, nor will it carry more than 15 to 20 head of cattle.

J. R. Parker testified that the property is not suitable for a dairy ranch. He also said that it took 15 acres to support one cow. He further asserted that the ranch was not capable of supporting 400 ewes and their lambs the year around.

John Rohr said that with the alfalfa patch and the hay field not included, the ranch would not support more than 100 to 125 ewes with their lambs. Phillipi estimated the capacity as 75 to 125 ewes with their lambs, depending upon weather conditions in any given year. Walter Krozier said he had run 140 head of sheep on the place during the time he was there, but that he had the use of the alfalfa patch and the hay field. He estimated that the 225 acres on the hill would run 50 to 75 head of sheep. Tom Hastings, from whose father defendant purchased the place, said that 120 head of ewes was the maximum number his father had run on the place, which included the alfalfa patch and hay field. Roy Quinton, who had lived in Douglas county for 30 years, said it would not be safe to run over 100 head of sheep on the land covered in the contract between plaintiffs and defendant.

All these witnesses testified that liver fluke and lung worm were prevalent diseases with sheep run on the premises. Many died from disease, and continual doctoring was necessary. Neither Newnes nor defendant advised plaintiffs as to the prevalence of such diseases.

At one time and for a few days only, Rohr and Phillipi held 400 sheep on the place, in connection with their business of buying and selling sheep. According to the witness Quinton, at one time about 30 years prior to the trial, "Grandfather Hastings" had stocked the place with 200 head of two-year-old ewes, but dur-

ing the year lost many of them because of disease. Other than these two occasions, the evidence discloses that approximately 165 head of sheep was the maximum number ever run on the entire ranch at any one time.

## CROP PRODUCTION.

There is no substantial evidence in the record that in addition to livestock capacity the "ranch will produce 50 to 100 tons of hay from permanent pasture mixtures." In truth, the record discloses that aside from the alfalfa patch and the hay field, the ranch had no real productive capacity whatever; it consisted of poor soil, and such permanent pasture mixtures as were sown produced only from "poor" to "fair" stands of grass.

## REMARKS.

The statement in the propectus that $37,500 was not an inflated price for the premises, and that the owner had this amount invested in the property, are statements of fact. The evidence reveals that for the particular land being sold plaintiffs, the sum of $37,500 was a grossly inflated price, and it also shows that defendant did not have that amount of money invested in that part of the ranch. It is true that defendant made some valuable improvements upon the place after his purchase thereof, and that he also sowed some seed for permanent pasture mixtures. However, the 23½-acre alfalfa field reserved from the sale to plaintiffs, when sold, provided a return to defendant of all his original investment in the entire tract of land. Further, the 57½ acres also withheld had a value of $300 per acre according to defendant's own estimate, or a total value of $17,250. From this it is manifest that insofar as the actual investment of his funds was concerned,

defendant had but little, if any, investment left in the land itself, that is, in the 407 acres being sold to plaintiffs.

Moreover, we are satisfied that defendant, when testifying in support of his representation that he actually had $37,500 invested in the property, intentionally exaggerated the amounts of his claimed expenditures. He had no receipted bills or other evidence to corroborate his claims. He prepared a written statement of these alleged expenditures as follows:

| | |
|---|---:|
| "Land cost | $10,140.00 |
| Painting house | 350.00 |
| Painting barn | 150.00 |
| Repair roof house | 75.00 |
| Porch on house | 100.00 |
| Repair fireplace | 65.00 |
| Improvement kitchen | 50.00 |
| Install lge. Elec. Heater | 260.00 |
| Well drilling building | 275.00 |
| Well house | 300.00 |
| New roof on barn | 100.00 |
| Remodeling barn | 250.00 |
| Building wing on barn | 75.00 |
| Concreting barn floor | 350.00 |
| New implement & hay bldg. | |
| Clearing trees & Brush | 1,200.00 |
| Farm equip. & Live Stock | 10,500.00 |
| Repairing hen house | 200.00 |
| Elec. pump for pasture | 150.00 |
| Rental of equipment | 340.00 |
| Shovel for roads | 100.00 |
| Gravel hauling | 150.00 |
| Seed | 1,825.00 |
| Wages | 9,000.00 |
| Wages for self at $125 per mo. | 2,375.00 |
| Surveying | 305.00 |
| 730 rods of fencing | 840.00 |
| | "$39,405.00." |

It is obvious that the item "land cost" has no substantial basis in fact. The total cost to defendant of the entire ranch of over 500 acres was only $16,500. The two best portions of the property (the alfalfa patch and the hay field) were not included in the sale to plaintiffs. Clearly, the figure set by defendant is an arbitrary figure and, when considered in the light of the value of the land reserved, is an unreasonable figure.

It is self-evident that the item of $500 for painting did not represent the cost of the paint. Included therein must be the labor involved in the painting. Defendant testified that he did the painting himself. Therefore, whatever part of the $500 item is for labor would constitute an overcharge because, as later shown in defendant's statement, he made a fixed charge of $125 per month for his services during the entire period of time he was on the premises.

Defendant also claimed an investment of $1,825 for seed. Upon being cross-examined, defendant admitted that the United States government, as a part of its conservation program, paid a portion of the cost of the seed. He testified as follows:

"Q Now, Mr. Humphrey, under the conservation set-up, was there an arrangement with you that the conservation would pay for part of the seed and part of the pumps and other improvements you made on the place?

"A Yes, sir.

"Q Well, what percentage of that cost figure that is included in your investment would be paid by the conservation arrangement—by the government under a conservation arrangement?

"A I do not recall, sir, just what that percentage was. I know that there was a kick-back on wells, a kick-back on dams that was built and seed,

if used for pasture, but whether that was ten cents a pound or a dollar a pound, I don't recall.

"Q Was that kick-back included in arriving at your figures as to the capital investment?

"A I would say that it was not because I don't think that was thought of when he asked for these figures."

The foregoing is a clear indication that defendant was, at least, careless with the truth when he prepared his written statement of expenditures. This alone is sufficient to create a substantial doubt as to the truth of any of defendant's claims. In *Meads v. Stott*, 193 Or 509, 534, 238 P2d 256, 239 P2d 594, we suggested that where there is a conflict in the testimony, "a straw will show which way the wind blows."

We also are far from being convinced that defendant invested $10,500 in the equipment and livestock to be sold to plaintiffs. Neither in his statement of expenditures nor in his testimony did defendant show, or attempt to show, what the original cost of the property was, nor from whom it had been purchased. All we have to support plaintiff's claim as to this investment is his bald statement thereof. In this connection it is significant that in the sales price to plaintiffs the value of the land was set at $32,500, and the livestock and equipment, at $5,000.

We further note from the statement that defendant claims he invested $9,000 in wages for the services of others than himself. In addition to this, he claims a further investment of $2,375 for his own services. We assume that at least a portion of the $9,000 represented wages paid to Krozier and Newnes. For a part of the time he was employed by defendant, Newnes was paid at the rate of $125 per month, and this was later in-

creased to $150 per month. Perhaps Krozier was paid at the rate of $125 per month. If we are correct in our assumptions, then approximately $6,000 of the wages claimed as an investment in the land represented money paid to Krozier and Newnes. This leaves $3,000 to be accounted for. Aside from defendant's testimony that he paid $15 per hour for some bull-dozing on the ranch over a period of one week, the record does not reveal any other expenditures for help. At most, the bull-dozing would not have cost in excess of $840. Was this included in the item of $1,200 charged for clearing trees and brush? Reason suggests that it was. If so, here again defendant has made a claim for the same thing twice. That still leaves approximately $1,500 to $2,000 of the $9,000 charge wholly unaccounted for.

Moreover, the evidence discloses that Krozier and Newnes, as well as defendant himself, devoted the greater portion of their time to the care of the stock and in carrying on general ranch operations. True, they did do some work in the way of sowing seed for permanent grasses, in erecting and repairing fences, and in making other improvements, but that was but a small percentage of the total labor they performed.

It is perfectly obvious that wages paid could not be properly considered as an investment in the land, excepting only that part which might be allocated to the making of permanent improvements. There is nothing in the record by which we are able to determine what allocation should be made. However, we are convinced that the claimed investment in wages is grossly inflated.

Besides, we are of the opinion that as against any wages paid, there should be credited income from the property. Defendant admitted that for several years

the income from the ranch was sufficient to cover all wages paid. Aside from his admission, the record shows that the income was much greater that the amount paid as wages.

We note also that defendant claims an investment in the land of $305 for surveying. How could the cost of surveying be deemed an improvement to the land, or as an investment in the land? It may be that such surveying was necessary to set off the 23½-acre alfalfa patch and the 57½-acre hay field, but that certainly could not be deemed a permanent improvement to the remaining 407 acres sold to plaintiffs.

As before observed, the representation contained in the prospectus as to the amount of money defendant actually had invested in the land constituted a representation of a material fact. Like the statement of expenditures we have been discussing, this representation in the prospectus was misleading and deceiving; it was a false statement. It was a representation of a fact as to which only defendant knew the truth. It is clear that plaintiffs had no means of discovering its truth or falsity, no matter what sort of inspection or investigation they could or did make. It was a statement upon which plaintiffs had a right to rely, and upon which they did rely. The searching inquiry of the trial, and only that, disclosed the truth.

In evaluating plaintiffs' conduct and to determine what effect should be attached to the personal inspection of the premises made by them, we must consider their limited experience and, in particular, their complete ignorance as to livestock, farming, irrigation, soil, and weather conditions in Douglas county. We must keep in mind the fact that at the time of year the investigation was made the ranch presented its best

appearance. The grass was green and there was an abundance of water. Plaintiffs were impressed by what they were able to see, as their view seemed to corroborate the truth of the statements contained in the prospectus. At that time no inspection that they could have made would have disclosed what the conditions would be when the rains had ceased; a time when the weeds would appear, the grass would dry up, the ground would become hard and cracked, and the stream would diminish to a mere trickle of water. Of course, from the inspection that they did make, it would be and was impossible for plaintiffs to ascertain the facts respecting the property's actual livestock capacity. It is evident from the record that in entering into the contract with defendants, plaintiffs were induced to and did rely upon the truth of the representations contained in the prospectus. Their personal inspection of the property has no bearing upon this case except to the extent that it seemed to confirm the truth of what was stated in the prospectus, and further confirmation was contained in the information conveyed to them by Newnes.

In their pleadings and upon the trial, plaintiffs endeavored to allege and prove all the essential elements of actionable fraud. That was unnecessary as a condition to their right to rescind.

The right of rescission does not, as the right to recover damages in a common-law action for deceit, depend upon fraud. If the transaction was the result of a false representation of a material fact, relied upon by another, it cannot stand against the injured party's right to rescind, however innocently made. *Dahl et al. v. Crain et ux.*, supra; *Weiss and Hamilton v. Gumbert*, 191 Or 119, 227 P2d 812, 228 P2d 800;

*Sharkey v. Burlingame Co.*, 131 Or 185, 197, 282 P 546, 550; Restatement, Contracts, 908, § 476.

Because of the material misrepresentations made to them, plaintiffs had the right to rescind the contract, provided they acted promptly, which they did. On May 3 or 4, 1947, they advised defendants by telephone that they were rescinding the contract because of the misrepresentations made to them. At that time plaintiffs were entitled to a return of the money paid by them to defendants, and also the money deposited by them in escrow; defendants were entitled to possession of the real and personal property.

However, defendants denied plaintiffs' right to rescind, insisted upon a performance of the contract, and refused to return the money. They also refused to take possession of the ranch or to place someone in charge thereof for them. There was no formal offer by plaintiffs to restore to defendants the ranch, its equipment, and livestock, until the complaint was filed in this suit, but in view of defendants' acts and conduct as outlined, no such formal offer was necessary; it would have been a vain and idle thing. The request of plaintiffs that defendants take possession of the property was tantamount to an offer to place defendants in statu quo.

Plaintiffs were not required to abandon the premises upon defendants' refusal to accept the return of the property, and by taking possession and operating the ranch they were not treating the property as their own. Under the circumstances of this case, plaintiffs had a right to continue the operation of the premises for the benefit of defendants, and to protect themselves. Of course, upon rescinding the contract, plaintiffs could have abandoned the property, but they

were not required to in order to preserve their right of rescission. *Widmer v. Leffelman,* 196 Or 401, 249 P2d 476, 478; *Widmer et ux. v. Leffelman,* 187 Or 476, 494, 212 P2d 737.

In carrying on the ranch operations, plaintiffs were fully empowered to take all steps reasonably necessary to the conduct of the business. This included the right to plant and raise crops and sell them, as well as the right to sell the livestock at the times it should be sold; in other words, plaintiffs had the right to carry on the business of the ranch for the benefit of defendants, as well as for their own protection, just as they might have been expected to carry it on were they the owners thereof. Any time defendants became dissatisfied with plaintiffs' methods of operation, they had the right to take charge of the operations themselves, which they finally did do in August, 1948. It must be remembered that it was the misconduct of defendants and their positive refusal to recognize a rescission that made operation of the ranch by plaintiffs necessary. Plaintiffs kept all receipts from sales of products or livestock in a separate fund for the use and benefit of defendants and, of course, must account to defendants therefor.

On the other hand, as we held in the *Widmer v. Leffelman* cases, supra, plaintiffs were and are entitled to reasonable compensation for their services performed in such operation of the business of the ranch. Presumably, plaintiff himself performed those services. At the time Newnes left defendants' employ, he was being paid for his services at the rate of $150 per month, and this might be considered a reasonable going wage for that type of work. As bearing upon this matter, we note a letter written by plaintiffs' attorney

to Rufus Bailey, attorney for defendants, under date of June 9, 1947. It states:

"This letter is to advise you that my client, William Schuler, is now occupying the Humphrey's ranch for the purpose of caring for the livestock located on said ranch. He is demanding that he be compensated by the owner of such ranch and livestock while he is looking after the same. Since Mr. Noons [Newnes] was being paid $150 per month, we assume Mr. Humphrey will accept this as a reasonable figure."

However, no evidence was offered on the trial by either party concerning the reasonable value of plaintiff's services. Though an issue in the case, it was not determined. We are of the opinion that the amount to be allowed plaintiff for his services should be a subject for further hearing before and decision by the trial court.

Plaintiffs should be charged with all the net income they received from the ranch operations while they were in charge thereof. Some account of this was given on the trial, but it is not complete, making it impossible for us to say just what the total amount of such net receipts might be.

█ The $10,000 in escrow with California Bank is plaintiffs' money, and they were entitled to its return upon the rescission of the contract on May 4, 1947. It has not yet been returned to them. Since May 4, 1947, plaintiffs have been denied the use of this money solely because of the misconduct of defendants and, particularly, by reason of defendants' refusal to recognize the rescission. It is defendants' duty to place plaintiffs in statu quo. This would mean restoration of the $10,000 in escrow as of the date of rescission. Without interest on the money, this result would not be

accomplished. Plaintiffs are entitled to recover interest on said sum of $10,000, at the rate of six per cent per annum, from May 4, 1947, until the principal sum has been returned to them by California Bank. *Kennedy v. Koopman,* 166 Mo 87, 65 SW 1020, 1021; 33 CJS 203, Interest, § 60. Defendants have had the use of the $10,000 paid to them in cash upon execution of the agreement. Plaintiffs rescinded the contract and demanded this money from defendants on May 4, 1947, and it, therefore, became due plaintiffs on that date. For that reason, plaintiffs are entitled to interest on that sum at the rate of six per cent per annum from May 4, 1947, until paid. *Weiss and Hamilton v. Gumbert,* 191 Or 119, 143, 227 P2d 812, 228 P2d 800.

The decree of the trial court is reversed and this cause remanded with directions as follows:

A decree shall be entered cancelling, setting aside, and holding for naught the contract of sale and purchase entered into between plaintiffs and defendants for the real and personal property located in Douglas county, Oregon, together with the escrow instructions executed by the parties and which were delivered to and are held by California Bank, Van Nuys, California, as escrow agent.

The trial court shall conduct a hearing for the purpose of determining the net amount of cash receipts received by plaintiffs in connection with their operation of the ranch, and to which defendants are entitled, and off-set that amount against any sums of money awarded to plaintiffs, and shall also hear evidence and determine the amount to be allowed plaintiffs for their services.

A judgment shall be entered in favor of plaintiffs and against the defendants for such sum as the trial

court shall find to be the reasonable value of the services performed by plaintiffs, together with the further sum of $10,000, with interest thereon at the rate of six per cent per annum from May 4, 1947, until paid, together with interest on the sum of $10,000 belonging to plaintiffs and in escrow, at the rate of six per cent per annum from May 4, 1947, until such principal sum has been returned to plaintiffs by California Bank, against which sums there shall be off-set the amount of net receipts before mentioned.

The decree shall provide that plaintiffs shall have a lien upon the real and personal property involved, as security for the payment by defendants of the several amounts of money due plaintiffs.

Plaintiffs are entitled to costs.