Argued September 14, affirmed December 15, 1971

DISPOSAL TECHNOLOGY, INC., *Appellant, v.*
EHRLICH ET AL, *Respondents.*
491 P2d 1009

*Gerald R. Pullen,* Portland, argued the cause and filed the brief for appellant.

*Robert C. Wall,* Portland, argued the cause for respondents. With him on the brief were Reiter, Day, Wall & Bricker, Portland.

Before O'CONNELL, Chief Justice, and McALLISTER, HOLMAN, TONGUE, HOWELL and BRYSON, Justices.

HOWELL, J.

Plaintiff filed this suit seeking rescission of a contract to purchase all outstanding shares of the defendants' stock in Western Manufacturing, Inc., on the grounds of fraud and misrepresentation. Defendants filed a counterclaim requesting foreclosure of a stock pledge which was part of the purchase agreement. The trial court found that plaintiff was not entitled to rescission and allowed defendants' counterclaim for foreclosure of the stock pledge. Plaintiff appeals from the decree in favor of defendants.

A review of the facts is necessary.

In 1968 the defendants organized Western Manufacturing, Inc., with defendant Ehrlich as president and Cromer as secretary. Ehrlich had invented a machine called an "Alley-Gator" which was to be used to grind refuse and to reduce lumber and waste building materials into chips. By July, 1968, only one machine had been manufactured, and it was sold to a Jack Farnham in California. The machine did not operate properly. Another Alley-Gator was being manufactured for possible sale to a railway company, but it was still in Western's plant. Western had also designed a machine called a "Tie-Grinder," to be used to grind up railroad ties, and the railway company was also interested in purchasing this machine.

Because of the unique features of the Alley-Gator, it received some notoriety and eventually came to the attention of a Matt Dutton in early 1969. Dutton had no engineering experience. He was president of Contacts Influential, a company which prepared and sold business directories, and was also owner of Newcomer Service, which introduced newcomers to Portland business firms. Dutton apparently heard that Western could be purchased and attempted unsuccessfully to secure financing from a friend in California. Later, Dutton was able to interest a Ralph Scheidt in purchasing Western. Scheidt's background was originally in the field of oil exploration, but at this time he was an officer in various businesses ranging from distribution of snack foods to sales of campers and trailers. Also, at this time, he was at least a part owner of Swan Industries, which manufactured baseboard heaters. He was "out looking for deals."

Scheidt and Dutton formed plaintiff corporation in May, 1969, and entered into an agreement with the

stockholders of Western Manufacturing, Inc., to purchase their stock for a total price of $500,000. Dutton received 30,000 shares of plaintiff corporation for his services in arranging for the purchase of Western and became president. Scheidt became chairman of the board of directors. The purchase agreement with Western required a down payment of $75,000 on May 29, 1969, the closing date of the agreement, and the next payment of $50,000 was due on August 15, 1969. The purchase contract also included a pledge agreement whereby plaintiff pledged the Western stock as security for its performance under the contract to purchase. Plaintiff paid the down payment but was unable to make the payment due on August 15, 1969.

During the negotiations for the purchase of the stock in Western, Ehrlich and Cromer of Western did not inform the purchasers of the problems with the one Alley-Gator that had been sold.

Plaintiff first became aware of the problems with the Farnham Alley-Gator in early June, 1969. Plaintiff's representatives went to California, determined the machine was not doing the job, and returned it to Portland in early July, 1969. From July until September 4, 1969, plaintiff attempted unsuccessfully to solve the machine's problems. Plaintiff's engineer then advised plaintiff that the design was faulty and that it would require an expenditure of $250,000 to ready it for manufacture.

During the negotiations for the sale of Western stock, Cromer and Ehrlich of Western gave plaintiff a balance sheet stating the financial condition of Western as of March 31, 1969, and warranted that no financial changes had occurred between March 31, 1969, and May 29, 1969, the closing date of the sale.

On April 3, 1969, Western borrowed $10,000 to pay for machine tools which Western had been using. The defendants did not mention the note to plaintiff, and, as it was executed after March 31, 1969, it did not appear in the balance sheet.

In its complaint the plaintiff alleged that defendants falsely represented that the Alley-Gator was fully developed, satisfactorily tested, free from problems, ready to market, and that the one sold to Farnham was free from defects. Plaintiff also alleged that defendants warranted that there had been no changes in Western's financial condition after March 31, 1969, when, in fact, it had increased its obligations by an additional sum including the $10,000 note.

The trial court found that plaintiff had "grounds for relief," but that plaintiff waived its rights to rescission by its "material delay and its continued conduct toward the subject matter of the contract," and that plaintiff by its actions had affirmed the contract.

The evidence is clear that the machine sold to Farnham, and which was Western's only operational machine, did not function properly from the time of its delivery to Farnham in the summer of 1968 until it was finally returned by Farnham in July, 1969. It had been returned for repairs in December, 1968, and returned to Farnham in the spring of 1969. Prior to the purchase of Western's stock, the machine was still not operating properly and, according to Farnham, he so advised Ehrlich and another officer of Western before May 29, 1969. He also advised Cromer of Western that he could not make the May 2, 1969, payment because he was not getting production from the machine.

Ehrlich, Western's president, testified that he assumed that Farnham was happy with the machine and

that it was working satisfactorily. He also stated, however, that he did not tell the purchasers about Farnham's problems with the machine because "they didn't ask." In response to a question as to whether he had told the purchasers about the machine and its performance, he answered, "I figured they didn't have to know any. They didn't seem to ask me any questions."

Dutton testified that Ehrlich told him the Farnham machine was "tried, tested and it was the machine that worked, it did the job."

In regard to the defendants' failure to disclose the April 3, 1969, note for $10,000 Cromer, Western's secretary, testified that he knew of the note but did not mention it to plaintiff at the time of the sale. He explained the execution of the note by stating that some of the machine tools had been loaned to Western by Waco Company, so Western borrowed $10,000 and paid it to Waco, which was a corporation partly owned by Cromer.

■ We agree with the trial court that the evidence sustains plaintiff's allegations of misrepresentation of the condition of the machine and the financial status of the company as of the time of the sale.

However, we also agree with the decision of the trial court that plaintiff did not act promptly to rescind, and by its actions ratified the contract.

■ Within two weeks after purchasing the stock of Western, the plaintiff knew of the problems with the Farnham machine. Plaintiff's representatives, including its engineer, went to California, tested the Farnham machine, and returned it to Portland to attempt some changes to make the machine operate properly. Between early June and late September, 1969, when plaintiff gave notice of rescission, the Farnham ma-

chine had failed every test; the other Alley-Gator was disassembled part of the time; the tie-grinder did not work; and plaintiff did not have the funds to make the August 15, 1969, payment to defendants. By August 6, 1969, plaintiff had been notified that Farnham was going to rescind the agreement to purchase the Alley-Gator and sue for damages for breach of warranty.

At this time Dutton, plaintiff's president, called McDaniel, his friend in California from whom he had attempted originally to raise the money to purchase Western. McDaniel answered in a letter dated August 15, 1969, and stated in part:

"I have two groups that were really interested in the sale of Western and may still be interested in buying it out! If you are really interested in dumping I think that I may be able to help you out. It would be best that the people here think there is descent [sic] among the stockholders and officers as the reason for selling. Give me the following: Sales price that you want; Balance sheets that look good; sales projections; Cost and expense estimates; history of company. I would suggest that you get your Dick W. to do figures and sign them but NOT certify them. It always looks better to have an accountant do statements. These people here are SHARP and will check out everything but, as you know, there are many figures than can be legitimately [sic] padded to make things look better."

In response Dutton wrote to McDaniel and stated:

"Enclosed is information on DISPOSAL TECHNOLOGY, INC. As you can see, the potential for this company is terrific. * * * The price we are asking is $800,000."

The information submitted described the Alley-Gator in detail and stated that "we are now ready to market a tested piece of equipment" and referred to various

sale contracts to purchase Alley-Gators and Tie-Grinders. Under "Funds" the document stated the following :[1]

| | |
|---|---:|
| "Cash in Bank | $ 75,000.00 |
| Equipment | 85,000.00 |
| Inventory (40 Alley-Gators, 40 Tie Grinders) | 200,000.00 |
| Plant (new) | 250,000.00 |
| Research & Development (Tire-Grinder [sic]) | 125,000.00" |

All of this information was patently and flagrantly false.

Since the decision in *Scott v. Walton*, 32 Or 460, 52 P 180 (1898), this court has consistently followed the rule that:

"A party who has been induced to enter into a contract by fraud, has, upon its discovery, an election of remedies. He may either affirm the contract, and sue for damages, or disaffirm it, and be reinstated in the position in which he was before it was consummated. These remedies, however, are not concurrent, but wholly inconsistent. The adoption of one is the exclusion of the other. If he desires to rescind, he must act promptly, and return or offer to return what he had received under the contract." 32 Or at 464.

----

[1] On September 25, 1969, at the request of McDaniel, Dutton prepared another report on Disposal. The report stated that the reason Disposal wanted to sell was "basically a monetary one." The report also included a copy of Western's balance sheet as of March 31, 1969, the one which plaintiff contends was inaccurate in several respects.

However, the latter report was not mailed by Dutton. He gave the following reason for not mailing it:

"Well, I did prepare it. I talked to our counsel and this is the time that we were starting—to get to the point where we felt we were going to have to rescind possibly. So I don't feel it would be right to bring some other people into it at this time."

■ Another rule which has become firmly established in this state is that the acts of a defrauded purchaser in attempting to re-sell the property after knowledge of the fraud, while not conclusive, is evidence of a waiver of the buyer's right to rescind and an intent to affirm the contract. *Schuler et ux v. Humphrey,* 198 Or 458, 480, 257 P2d 865 (1953); *Miller et ux v. Barker et ux,* 233 Or 113, 377 P2d 343 (1962).

The acts of the plaintiff in the instant case in offering the company for sale and at a price which would have produced $300,000 profit constituted an affirmance of the contract. Additionally, plaintiff's misrepresentations of the condition of the company were even in excess of the misrepresentations plaintiff charged against defendants. In this posture of the case, the opinion of this court in *Belanger v. Howard,* 166 Or 408, 112 P2d 1022 (1941), involving similar acts by a vendee, is particularly appropriate:

> "He came to a court of equity claiming that he had been victimized. Nothing less than frankness should have been manifested by him. In his efforts to prove that he had been defrauded he should not have come forth as a willing perpetrator of fraud upon others." 166 Or at 418.

Affirmed. Costs to neither party.

McALLISTER, J., dissents.